For Clerk's Office Use

| Judge | Recd Date | Grv. |
|-------|-----------|------|
|       |           |      |

For use by inmates in filing a complaint under **CIVIL RIGHTS ACT, 42 USC §1983**

**INMATE NAME:** _Terry K. Ofori_

**PRISONER NO.:** _1165768_

**PLACE OF CONFINEMENT:** _Wallens Ridge State Prison_

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

NOV 18 2019

JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

_Terry K. Ofori,_ _____,
Enter Full Name          Plaintiff

**VS.**

_Harold W. Clarke, et. al.,_ _____

_____
Enter Full Name(s)          Defendant(s)

**CIVIL ACTION NO.** _7:18-CV-00587_

A.   Have you begun other actions in state or federal court dealing with the same facts involved in this action or otherwise relating to your imprisonment?

_____ Yes   ___✓___ No

B.   If your answer to A is Yes, describe the action in the space below.

1.   Parties to the Action:   _____ N/A _____

_____

2.   Court:   _____ N/A _____

3.   Docket No.:   _____ / / _____

4.   Judge:   _____ / / _____

5.   Disposition:   _____ / / _____

(For example, is the case still pending? If not, what was the ruling? Was the case appealed?)

C.   Have you filed any grievances regarding the facts of your complaint?

Yes   ___✓___   No   _____

1.   If your answer is Yes, complete the enclosed verified statement, indicating the result.   Please attach evidence of your exhaustion of all available grievance procedures.

_____

2.   If your answer is No, indicate the reason for failure to exhaust on the verified statement.   You may be required to exhaust your claims through any applicable grievance procedures.   Your complaint may be dismissed if you fail to exhaust all avenues of the grievance process in a timely fashion.

D.  Statement of Claim - State here briefly the facts of your case.  Describe what action(s) each defendant took in violation of your constitutional rights.  Include also the names of other persons involved, dates and places.  Do not give any legal arguments or cite any cases or statutes.  If you intend to allege a number of different claims, number and set forth each claim in a separate paragraph.  Use as much space as needed.  You may attach extra paper if necessary.

Claim #1 - Supporting Facts - Tell your story briefly without citing cases or law.

_____*See Attachment(s)*_____

_____

_____

Claim #2 - Supporting Facts - Tell your story briefly without citing cases or  law.

_____*See Attachment(s)*_____

_____

_____

Claim #3 - Supporting Facts - Tell your story briefly without citing cases or law.

_____*See Attachment(s)*_____

_____

_____

E.  State what relief you seek from the Court.  Make no legal arguments, cite no cases or statutes. _____*See Attachment(s)*_____

_____


SIGNED THIS ___*4th*___ DAY OF ___*November*___ , 20 *19* .

                                   *Terry K. ofori*
                              *(also) See attachment(s)*
                              (Signature of Each Plaintiff)

**VERIFICATION:**

I, ___*Terry K. ofori*___ , state that I am the plaintiff in this action and I know the content of the above complaint; that it is true of my own knowledge, except as to those matters that are stated to be based on information and belief, and as to those matters, I believe them to be true.  I further state that I believe the factual assertions are sufficient to support a claim of violation of constitutional rights.  Further, I verify that I am aware of the provisions set forth in 28 USC §1915 that prohibit an inmate from filing a civil action or appeal, if the prisoner has, three or more occasions, while incarcerated, brought an action or appeal in federal court that are dismissed on the grounds that it was frivolous, malicious or failed to state a claim upon which relief may be granted, unless the prisoner is in imminent danger of serious physical injury.  I understand that if this complaint is dismissed on any of the above grounds, I may be prohibited from filing any future actions without the pre-payment of filing fees.

I declare under penalty of perjury the foregoing to be true and correct.

DATED: *Nov 4, 2019* SIGNED: ___*Terry K. ofori*___

-1-

# COMPLAINT

## I. JURISDICTION AND VENUE.

1.      This is a civil action authorized by 42 U.S.C §1983 to redress the deprivation, under color of state law, of rights secured by the constitution of the U.S. The court has jurisdiction under 28 U.S.C §1331 and 1343 (a),(3), Plaintiff seek declaratory relief pursuant to 28 U.S.C §2201 and 2202, plus claim(s) for injunctive relief are authorized by 28 U.S.C § §2283, 2284 and Rule 65 of the federal Rules of civil procedure.

2.      The Western district of Virginia is an appropriate venue under 28 U.S.C §1391 (b)(2) because it is where the events giving rise to those claim's or count's occurred.


## II. PARTIES.

3.      The Plaintiff, TERRY K. OFORI, was-at all times mentioned herein-a prisoner of the state of Virginia in the custody of the Virginia Department of correction (VDOC). He is confined in Wallens Ridge state prison (WRSP),-Big Stone Gap, Virginia.

4.      The Defendants in this action are:

-Agent (A), Mr. Harold W. Clarke, is the director of the VDOC and he is legally responsible for it's operation.

-Agent (B), Mr. A. David Robinson, is the chief of corrections operations for the VDOC.

-Agent (C), Mr. Leslie J. Fleming, was the warden of WRSP and his duties, in part, was to review all adminis., appeals of disc., charges (and address regular griev.) filed by inmates.

-Agent (D), Mr. Carl A. Manis, is the warden of WRSP, and his duties, in part, includes all matters dealing with security

-2-

or operations, and also that of **agent (E)**.

- Agent (E), Mr. Combs, is the assistant warden at WRSP, and his duties, in part, includes all matters dealing with food service; inmates and/or programs movements; and some-times assumes the responsibilities of the warden.

- Agent (F), Mr. Anderson, is the major/chief of security for WRSP and his duties, in part, is the supervision and discipline of officials who violat policy and/or proceders at the prison.

- Agent (G), Ms. R.D. Young, is/was the operations manager at WRSP and her duties, in part, was to over see the Law Library; arrange for inmates to access the institutional attorney; overseeing the informal complaint and grievance process; and etc.

- Agent (H), Mr. Brown, is/was a captain at WRSP and his duties, in part, (or for some-time) was the same as agent (G).

- Agent (I), Mr. W. Todd Ferris, is the CHP, and his duties, in part, is to oversee/review ICA hearings.

- Agent (J), Mr. Joseph B. Stallard, is the unit manager for B-building at WRSP, and his duty, in part, is to address most issues (related to security or otherwise) in said building.

- Agent (K), Mr. R. Cochrane, is a lieutenant at WRSP, and he was assinged to A, B, and C-building (for some time).

- Agent (L), Mr. B.L. Hughes, is a lieutenant at WRSP, and he was also assinged to B-building.

- Agent (M), Mr. D.C. Mullins, is a lieutenant at WRSP, and he was also assinged to B-building.

- Agent (N), Ms. B.J. Ravizee, is the institutional ombudsman and her duties includes logging/filing informal complaints and grievances.

— 3 —



—Agent (o-1), Mr. C.W. Franks, is a institutional hearings officer (IHO), and his duties, in part, is to conduct disciplinary hearings, and address other issues pertaining to O.p.861.1.

—Agent (o-2), Mr. W.R. Hensley, is also a IHO and his duties are the same as agent (o-1).

—Agent (P), Mr. Mitchell, is a chaplin and his duties, in part, is to maintain the enrollment process for religious services at WRSP.

—Agent (Q), Mr. Jones, is the Law Librarian, and his duties, in part, is to supply legal materials to inmates at WRSP.

—Agent (R), MS. S. Stallard, is the Food Service Supervisor at WRSP.

—Agent (S), Mr. Wright, was a Sergent at WRSP.

—Agent (S-1), Mr. Bryent, was a Sergent at WRSP.

—Agent (T), Mr. B.S. Roberts, is a Correctional Officer at WRSP.

—Agent (u-1), Mr. M. Napier, is a Correctional Officer at WRSP.

—Agent (u-2), Mr. Byington, is a Correctional Officer at WRSP.

—Agent (V-1), MS. M.L. Daniel, is a Correctional Officer at WRSP.

—Agent (V-2) Mr. Clark, is a Correctional Officer at WRSP.

—Agent (w-1), Mr. T. Leedy, is a Correctional Officer at WRSP.

—Agent (w-2), Mr. S.R. Farmer, is a Correctional Officer at WRSP.

—Agent (X), Mr. Start, is a Correctional Officer at WRSP.

—Agent (Y-1), Mr. Wroten, is a Correctional Officer at WRSP.

—Agent (Y-2), Mr. I.R. Thomas, is a Correctional Officer at WRSP.

—Agent (Y-3), Mr. W.K. Smith, is a Correctional Officer at WRSP.

—Agent (Z), Mr. M.D. Powers, is a Correctional Officer at WRSP.

All the defendants have acted, (and/or they continue to act), under color of state law at all times relevent to this complaint, — and they are being proceeded against in their official and personal capacities.

-4- ## III. FACTS.

5.     At all times relevant to this case, Plaintiff named above (and mentioned herein) was a prisoners being housed at 'Wallens Ridge State Prison' (W.R.S.P).

6.     Within 2016 to 2019 Mr. Ofori noticed several issues at the prison which unlawfully deprived him and other inmates of their rights plus privileges and his efforts — sometimes collectively with the aid of other inmates — to address or resolve said issues resulted in them being abused, harassed, threaten, retaliated, discriminated, and conspired against.

## ___ COUNT I - DEPRIVATION OF RECREATION ___

7.     Plaintiff and other inmates at W.R.S.P. have been and continue to be subjected to violations of their rights and privileges via.,

8.     First: inmates at the prison are supposed to be subjected to in-pod (house) recreation for a minimum of three and a half hours (or more) during the day and one hour every other night, on the night shift, split between both pod tiers, unless unforseen security measures prohibit otherwise. ~~But~~ But, they are only being provided — on most days — an hour or an hour and a half per tier, especially on weekends, state or federal holidays, night shifts and when building supervisors, and the institutional administrator(s) are not on duty, though not limited to such, (note: said recreation is also refered to as "out of cell-movement").

9.     W.R.S.P. has been authorized by agents (E),(F),(C),(D),(G), building supervisors, and finalized, plus signed by agent (A) and/or (B), for an appropriate recreational schedule and

-5-

all other institutional activities. ── Outside of School and religious programs - plus security head counts, - inmates are scheduled for pod recreation starting after 5:45 a.m., security count is cleared, till chow is started at approximately 7:00 a.m. After breakfast is served recreation is to continue, and to be rotated an hour per tier till outside rec is called, (maybe lunch call), or evening count at about 12:45 p.m., which-ever activity is listed, -if any-. After activites outside of in-pod rec, count, and chow, rec is continued rotated between tiers untill 5:30 p.m., evening count.

10.      However, Plaintiff and other inmates at W.R.S.P. are only receiving a maximum of an hour, or an hour and a half per tier, majority of the days, especially on the days and occasions previously described, because the Floor officers are either taking unauthorized break's by leaving the building, sleeping in the staff office, or gun/control booth, or having the inmate worker's clean the pod for hours at a time so the rec schedule is procrastinated and no further in pod (and some-times outside) rec is conducted, and although not having─proper or documented─ authorization by the Shift commander(s) to procrastinate, and not pull pod rec as authorized and scheduled by the authorities named above, the Floor officers immediate superior(s)/building sergeants (and sometimes, building lieutenants plus some unit managers) do allow such lack of rec by staff.

11.      Second: VDOC/WRSP officials practic a pattern of prison pod(s) and/or tier(s) wide disciplinary lock downs (cell restriction) in general population for substantial perods of

– 6 –

time, without any lawful justification... i.e., plaintiff and other
inmates at W.R.S.P are not supposed to be subjected to collective,
group, or summary punishment(s) unless they are specially labeled
by the appropriate authorities as a security threat group (STG),
and if their privileges are taken it must be done individually, and
by due process, such as by way of an institutional infraction, —
nor are prison officials allowed to subject inmate(s) to said
punishments for the isolated actions (or misbehaviors) of
other inmate(s).

12.        However, the prison administration regularly places pod(s),
or tier(s) on lockdown - i.e., restricting inmates to their cells - for
days, weeks, and/or months whenever there's an isolated
incident or situation involving 1, 2, or more inmates. — i.e., said
lockdowns are for flimsy reasons or no reason at all, e.g., such
as isolated fights (most likely between two inmates on/from other
tiers), rumors of a potential fight/issues, plus the excessive use of
lockdowns also arose out of a conspiracy among prison officials -
by them exaggerateing their response(s) to minor incidents or
no incidents, in order to allow staff to leave work early (or
not to show up at all), and/or to psychologically punish all
or most of the inmates in a pod/tier for the misconduct(s) of a
few they don't like,- in short, they are often imposed for non-
penologically related purposes. Plus, upon information and belief,
building supervisors regularly relate or report false (or uncredible)
information about said incidents to agent (F) who then-(un)knowingly-
forwards it/them to agents (c), (E), and the institutional intelligence
in order to secure an approval for a recommended lockdown. And

-7-

in most cases no investigation is conducted because there is no threat or sufficient information to investigate but inmate(s) privileges and rights are still taken without due process.

13.    Finally: Plaintiff and other inmates at W.R.S.P. have reported said summary, collectiv, cruel and unusual punishments to several supervisors (or high ranking officials), however, their verbal and/or informal complaints goes without exhaustion, (and most times circumvented by agent(G),(H),(S),(N)& others, when ever a form is submitted on said issues - See Count VII and VIII).

___COUNT II - BEING SUBJECTED TO UNSAFE CONDITIONS___

14.    Plaintiff submits that officials - through policy, practice, and otherwise - have regularly subjected inmates to unsafe conditions in violation of countless of laws.

15.    First: Upon information and belief, VDOC and WRSP officials - i.e., agents (A),(B),(C),(D),(E) and (F) - are required (as tenant(s) of the prison(s)) to provide an adequate and safe means for inmates assigned to the top bunk to gain access to it, i.e., the cells that inmates are housed in at WRSP have inadequate (and/or no) access to the approximately 6-feet tall top bunk, e.g., there isn't any permenently affixed step ladder(s) in the cells, nor a chair to help inmates access the top bunks, and although some inmates come up with ways to aid their access i.e., by stacking-up their books, magazines, personal and legal papers to make a kind of leverage, box, or ladder, and stepping on the bottom bunks, or the wall affixed — about 3-foot tall — table/desk, these routes also causes issues

-8-

because most of those contraptions (i.e., boxes/ladders) are unstable, and almost all inmates assigned to the bottom bunk will not allow another inmate to step on their bunk's and/or bed to get up to the top bunk, plus-the lower desk/table is primarily used by those assigned to the bottom bunks (i.e., That's where their T.V's and other property is placed) — Thus, the last two instances are a great source of arguments or conflicts-amongst cellmates- and result in violence, (and agents (c),(D),(E),(F),(G) & (H) have failed to address it).

16.    Plaintiff submits that he has ▪▪ been assigned to the top bunk at one point or another during his tenure at W.R.S.P and that he has suffered physical injuries - and other loss- caused by attempts to get from and to the top bunk, (i.e., injuries such as falls, sprains & etc).

17.    Notwithstanding the duties or requirements of said agents, they deliberately maintained said cells in an unsafe condition — and that unsafe condition was known or with reasonable inspection should have been known to those agents- plus, the full extent of the hazard is of sufficient nature so as to still affect inmates who exercise ordinary care.

18.    **Second:** Upon information and belief, WRSP officials (i.e., agents (c),(D),(H),(E),(G), and (F)) have a responsibility - via., federal and state PREA statutes or provisions, etc, - to ensure that inmates (to include plaintiff) are not to be subjected to conditions and/or situations that results in them being exposed to voyeurism and/or sexual misconduct(s), abuse, etc, by other inmates or staff members, (but said agents have failed to address the issue(s) upon it being presented to them).

-9-

19.     There are two instances which continuously subjects or exposes inmates at the prison to situations where others — deviant inmates or staff — are intentionally invading there privacy, ie.; ① The partitions for the showers in all the pods at WRSP are only about 2½-feet in lenth, and fail to cover all of the torso of an inmate taking a shower, Plus ②, There are no official ways of putting up a partition in the cells to prevent ones cell-mate (who might be a sexual deviant) from possibly taking advantage while one is using the toilet, changing under-clothes, and taking a wash up or bird bath.

20.     The failure to provide an adequate partition for the shower — which should cover an inmates torso at the least — while in use, subjects inmates to an unsafe environment where they are not free from voyeurism and/or other sexual misconducts, i.e., The lack of said adequate partition(s) allows sexual deviants to look into the showers from almost any where in the pod (and/or the control booth). In addition, inmates with (extreme) cases of gynecomastia are even more in danger in this environment because although the current partitions do (sometimes) cover the genitalia, they don't cover the upper torso, thus said conditions are violations which amounts to — cruel and unusual punishment. also.

21.     Third: In late 2016 — when fences were erected to separate the recreation yards for the general population buildings at WRSP — inmates were officially cut off from accessing the water fountain(s) located in front of said buildings during outside recreation. (Plus, officials turned said fountains off.) — During recreation, most inmates engage in rigorous activities, e.g., working out/exercises, playing basketball, etc. — which they can

-10-

not otherwise engage in in their cell's or pods, and that requires access to drinking water because one can become dehydrated if the fluids lost through perspiration are not replaced.

22.    In addition, inmates in segragation are allowed 2-hours of outside recreation, and they too are subjected to said deprivations, (Plus there is no procedure or means in place to allow inmates access to the bathroom during outside rec - and this has resulted in several accidents), and upon plaintiffs (and other inmates) presenting said issues to agents (c),(D),(E),(F),(G),(H), & the building supervisors, their general or default response is/was that "the matter will be looked into," however it's going on 4-years and the matter has yet to be addressed, thus the lack of access to drinking water and/or bathroom during outside recreation constitutes as deliberate indifference which also amounts to a cruel and unusual punishment (especially on 90° and higher temperature days).

23.    Fourth: WRSP officials fail to provide inmates at the prison with a safe and secure environment by randomly assigning them to double cell without determining whether they are compatible - Besides inmates who submit cell-change forms into their building supervisors asking to be housed together, all other cell assignments are done by prison officials who never conduct any face to face with said inmate(s) to determine whether they will have any issues living in a cell together. (Since they will be stuck in said cells for 22½ - or most of the - hours out of a day due to the recreational issues at WRSP), e.g., finding out or determining if there will be a problem with each others

-11-

living habits, religious or social associations (or affiliations), medical needs, mental health or capacity (issues), sexual orientation, and etc.

24.      Although there's a procedure in place for inmates or cell-mates who find that they aren't being properly housed to request for a cell-change, most of those forms/requests to the building supervisors are regularly circumvented by said officials,— they simply would not process said forms or requests, stating (the prisons) policy or practice is that those requests can or should only be considered once every 6-months from when the applicant(s) were initially assigned to their current cell(s),— thus, cell-mates who aren't compatible are forced to live together for months (or more), which normally results in: ① one of them deciding to go to segregation by refusing to return to the cell (or otherwise), and receiving a charge which will prevent them (for over a year) from being transferred to a lower security level; or ② staying in the cell and eventually getting into an argument and/or conflict that results in violence.

25.      In addition, though some cell-moves are made upon request, building supervisors refuse others in order to proposition or coerce inmates i.e, they offer to process said cell-change requests if the inmate can/will provide any information on illegal activities in their pod(s) (or otherwise),—most of these advances are declined, which then leaves those inmates with one of the aforementioned fates— Upon plaintiff (and other inmates) presenting those issues to agents (c), (D), (E) and (F) they simply respond that the matter would be looked into, but said practices are still going on at the prison.

-12-

26.      Fifth: The manner(s) or way(s) by which officials deprive in pod (or other) recreation - see paragraphs 7 to 13 - has resulted in some unruly/selfish inmates appropriating means of/in the pod in the short amount of time pod rec is provided, thus, resulting in about half (or 2 out of 3 inmates on) a tier or pod being deprived access to said means/resources, - see paragraphs 30 to 31 - and agents (C),(D),(E) & (F) Know of said issues and that they are the main reasons behind most inmate(s) conflicts at the prison and some WRSP officials are aware of this (and even openly encourage said fights), but have failed to take the necessary steps to prevent said fights, i.e., providing more time for pod rec so there's more opportunities to access the shower, telephone, kiosk and etc.

27.      In addition, said situations are also made worse by agents (A) & (B) approving for staff/officers to be relocated from WRSP (or other prisons in the region) and be assigned - for week(s) and/or month(s)-at/to other prisons (most of the time in another region).— Thus, their action (of showing favoritism) causes the prison to be regularly short of staff, which results in inmates being deprived of recreation, plus, subjecting inmates to a segregation like environment which is made worse because they have to deal with a cellmate, and these condition are resulting in most of the inmates at WRSP being subjected to (or restricted to) their cell about 75 to 85% of the days out of a year (or 21 to 22 hr out of a day) - if not more - which has caused serious injuries (resulting from the inability to exercise outside or in the pod, or in their small (doubleman) cell(s) in the form of

- 13 -

irritable bowel Syndrome, Severe Stress, headaches, myopia, tinnitus, respiratory issues, muscle atrophy, bedsore, mental health issues, and etc., —— So, Said actions, are plain Violation.

28.      **Sixth**: Some procedures related to - or with - the Cells at the prison are also Sources of Conflict(s), Violence, and/or Victimizations amongst inmates (See Paragraphs #15 to 30; 23 to 25) and Prison officials are aware of Said issues but they turn a blind eye to it, i.e., inmates assigned to the top bunk who have to step on the bottom bunk in order to gain access to the top bunk risk incurring Some aggression From their cellmate(s); lack of adequate partition has resulted in Fights amongst inmates - Plus Sexual assaults -; Manner of assigning inmates a double cell produces increased risk of cellmate Violence; the practice of not allowing inmates - who are being Sent to Segregation From gen. pop. - to be Present while their personal property is being extracted from their cells and inventoried, has caused Some to be assaulted when items come up missing (note: Staff are known to use these occasions to Steal personal property from inmates and blame it on their cellmates); the practice of Conducting cell-searches while non (or only one) of the occupants of a cell is present, has caused Fights amongst cellmates when it is discovered that items are missing; etc.

29.      Some of these issues have been So dangerous and Serious that there are Still echos of their occurrence at the prison (even) years later, e.g., in/about 2007 it was discovered that Mr. Craig-L. Rowe, #301520 had been raping his Cellmate Mr. Raymond D. Grantham For months (and Said cellmate had been trying For awhile to get moved out of that cell); in/about 2008 Mr. Bobby Glison Killed his

-14-

cellmate - who he had been trying to get moved out of the cell from-; two separate inmates were discovered dead in their cells (on May 18, 2018 and august 1, 2018) under unknown circumstances - so WRSP officials claimed. —— Upon said issues being presented to agents (C), (D), (E) & (F), they failed to address the issues, and said violations still persist.

30.       Seventh: WRSP has an established methodical and systematic custom, practice and policy in which inmates - especially those with nonviolent ■ VDOC records - who challenge the administration via., the power of the pen, i.e., complaints and lawsuits are placed in pod(s) in which WRSP commonly refer to as "lockdown pod(s)" or "fighting pod(s)," to be oppressed, harassed, intimidated, threatened, and even injured by officers and inmates with prison records replete of violence... WRSP has placed such inmates in said pods upon (being) released from segregation with the mind frame - expressed by officials - of "LET THEM KILL THEMSELVES OR EACH OTHER." This is genocide!! when these fights occur in said pods, they go on lockdown for at list one month (give or take), although other pods only experience one to three days after similar fighting situations. Though WRSP will deny the existence of said pods at the prison, via CORIS (computer software) will support this contention.

31.       To detrimentally exacerbate the circumstances of/in said pods outside rec., or exercise and in-pod recreation are seldom given, allowing stress, tension, mental deterioration, and other negative emotions to build-up, thus heightening the potential for violence, (records and log books will support this).

—15—

Also, showers and access to telephone(s) are restricted drastically, each recreation period has (over) forty inmates who have to utilize 6 showers and (about) 7 telephones within an hour or sometimes 30 to 40 minutes. At times rec is limited to 15 minutes which prompts some inmates to cut lines set up to maintain order, often leading to arguments and ultimately escalating to violence. — Plus WRSP officials regularly direct unprofessional conducts towards inmates at the prison in order to elicit/cause a reaction (violent, hostile/otherwise) so they can have an occasion to take adverse action, i.e., profanity, unpolite, demeaning, disrespectful, indecent/insulting language or words with racial and ethnic undertones are directed towards inmates. (Further, they are known for taking out hits on inmates they don't like or who have complained about their actions — through other inmates or staff — and they are known to pay those inmates off (for said hits) with items they steal during regular walk-through cell serches and otherwise). Note, all these issues are mainly in said pods, but exist in other pods, although not as continuous...

32.        In addition, shaving razors are sold on commissary and freely given to inmates whom cannot afford them. Officers use these razors and exploit the fact that an open razor is arbitrarily declared a weapon, causing a inmate found in possession of an open razor to be placed in segregation for at least 6-months and loss of good time. Officers who simply dislike an inmate (or in reprisal) often frame them with razor(s) (and sometimes other contraband. These razors are not name-brand and can open by an accidental drop, such razors when planted or otherwise

discovered are not altered into shanks -for example- thus should not be considered as weapons, but officials at WRSP do in order to have said inmates sent to segregation and subsequently one of the aforesaid pods in order to be handled, silenced, and subjected to violations of their constitutional and other rights,— Thus, the above (and other hostile instances unmentioned) clearly shows that WRSP officials' actions, conduct(s), and/or proceedures —which are systematically or grossly deficient, and has dramatic disparities— have resulted in countless of confrontations, altercations, tensions, stress, fear of hostility and injury amongst the inmate population at the prison, and as a result causes all/most inmates to live in an unsafe and unsecured enviroment, and upon said violations being presented to agents (C),(D),(E),(F),(G) and (H) they failed to address them, (and as a result, excessive force and assaults by officers upon inmates dispite video tapes of such repeated incidents, as well as other vital exculpatory evidence, nothing is ever done to discipline the perpetrators of such officer on inmate violence/transgression

33.        Eighth: WRSP has no toothbrush holders for toothbrushes, which is inhumane as toothbrushes often decay or mildew due to lack of containers, and although inmates often try to improvise by using other means as containers, officers routinely throw the toothbrushes away when it's found, thus continuing to subject inmates to an unsafe situation (and depriving them of toothbrushes in some instances, without any due process). Plus upon said issue being presented to agents (C),(D),(E),(F),(G), and (H), it was never addressed

34.        Ninth: VDOC/WRSP subjects inmates to constant cell illumination (24-hours a day) and although there's an alternate

-17-

nightlight (which cuts on about 10:00 p.m) it is so bright that it interferes with inmates sleep - and inmates aren't allowed to cover it - thus this unnatural condition causes sleep deprivation, (insomnia) and has lead to other serious physical, psychological (or mental health) problems or harm plus a greate amount of institutional charges issued by staff - at the prison - is related to ~~███████~~ said issue/condition, and upon presenting said issues to agents (C), (D), (E), (F), and (G) they have went unaddressed.

35.        **Tenth**: VDOC and/or WRSP allows it's staff or health care provider to provide a wide spread systematic pattern or practice(s) - established customs and policy(s) - which denies inmates in serious need of medical (and/or other adequate) care by ⓐ instructing officers not to sing for or process any emergency grievances medically related (or otherwise); ⓑ encouraging (medical) staff to over look most requests for help with medical issues, and those practices by staff are also done to prevent inmates from documenting their medical issues and to minimize the cost of diagnostic testing plus any specialist referrals, and upon presenting the issues to agent (C), (D), (E), (F), (G) & (H) they went unaddressed.

36.        **Eleventh**: Over 75% of the trays that inmates food is served on/in - at WRSP - is verry old and unsafe, where there are flakes of plastic(s) peeling off into the food that's being served in them, — plus, as a result of these conditions the trays are never properly cleaned after each meal, e.g., plaintiff has recieved traies (before) with remains or resedue from food that was served days/meals prior, — and this has resulted in inmates getting sick, (and other health complications) plus dispite presenting the issues to agents (C), (D), (E), (F), (G), and (R), they still persist at the prison.

—18—

37.    **Twelfth**: WRSP officials force inmates' who are in the shower to lay on the floor (in the shower or in front of it) whenever there is a major incident or conflict in the/a pod, (or if/when the gun in the control booth goes off). — This unwarranted and dehumanizing practice by officials at the prison causes inmates in those situations - to include Plaintiff - to be exposed to contaminations (ie, urine, blood, fecal-matter, and etc), but upon said issue being presented to agents (c), (D), (E), (F), (G), (H), (I), (J), (k), (L), and (M), - plus other high ranking WRSP officials - they failed to address it, thus this clearly amounts to them (or their actions) being deliberate indifference to the safety/health of inmates at the prison, and subjecting inmates to a cruel and unusual condition.

38.    **Thirteenth**: WRSP officials fraudulent deprive inmates of their personal property upon arrival at the prison, ie., most inmates come to the prison with commissary items that are not sold at WRSP, (e.g. Ultra-bright toothpast(s); jalapeno peppers; and etc), however, WRSP officials deprive inmates of said items without any legitimate security reason(s), ie., Ultra-bright toothpast(s) are taken because officials claim it does not come in a see-through container, but WRSP sells sensodyne toothpaste(s) which does not come in a see-through container; jalapeno peppers are taken but the prison sells hot sauce; and etc, thus, these practices deprives (or defrauds) inmates of commissary item without any cause, and violates their rights. — Said conduct is also allowed by VDOC policy that fails to properly regulate the situation. — Upon presenting the issue to agents (c), (E), (F), (G), and (J), they failed to address the matter.

-19-

39.     Fourteenth: During routin Walk-Through Shake downs of cell(s) by officials at the prison, they always use the same gloves for the entire search of all the cells, and this always results in cross contamination, i.e., Plaintiffs submit that through their stay at WRSP they have observed - on numerous of occasions - prison officials going from cell to cell(s) (for their daily or weekly walk-through shake downs) touching inmates' wet and dirty clothes, toilet or cleaning rags, body wash cloth(s); digging through trash cans, and etc, (with all of those items being contaminated with fecal and other unclean matters), but then those officials - without changeing gloves - would pat down inmates, enter their cells and commence to touch drinking cups or mugs, eating bowls and utensils, bedding, commissary items, and other materials or personal property normally handled by inmates without any protection, thus exposing them to said contaminations, (note: most of the time said searches are conducted while inmates are at outside rec - or other-wise - not present - so it's unbeknownst to them that their personal property has been contaminated). - clearly this constitutes as deliberate indifference, which amounts to a cruel and unusual punishment, (which agents(c),(D),(E),(f), & others have failed to address).

40.     Finally: After plaintiff and other inmates at WRSP reported the above violations - which demonstrate that they are being incarcerated under conditions that pose substantial risk of serious harm and that VDOC officials know of and disregard excessive or dangerous risk(s) to inmates health and/or safety - to said agents, but their verbal and informal complaints went without exhaustion (plus, most-times circumvented by agent (G),(H),(J),(N), & others. See Count VII & VIII)

-20-    <u>COUNT III - UNLAWFUL  DEPRIVATION(S)</u>

41.          Plaintiff reallege and incorporates by reference paragraphs 7 to 40 and submit that several conditions or situations, within the VDOC and WRSP infringes on inmates (or his) rights and privileges, i.e;:

42.          First: Plaintiff submits that he is being deprived of access to publications, where his requests or applications to subscribe to (or obtain) the following (which might have had some nudity:

1). Senza (Photos).                  2) Penthouse (magazines).

3). Flix 4 U (Photos).                4) Black Tail (magazines).

Was denied by WRSP officials who stated that per VDOC policy O.P. 803.2 - no nudity is permitted.

43.          The policy (i.e., O.P. 803.2) under which they are denying access to said materials or publications is Unconstitutional (and overbroad). The purpose of said policy under state law is:

    "... [to ban] obscene [materials]... which considered
    as a whole has as it's dominant theme or purpose
    an appeal to the prurient interest in Sex, that is,
    a shameful or morbid interest in nudity, sexual
    conduct, sexual excitement, excretory functions,
    or products thereof or Sodomasachistic abuse and
    which goes substantily beyond customary limits of
    candor in description or representation of such matters..."

Va. Code §18.2-372, (See also Va. Code § 53.1-10(12)).

So, since (in fact) O.P. 803.2 bans all nude materials without any justification - but said statutes do not - how can

The policy be lawful. ——Under the U.S. Constitution, ~~the~~ Freedom of speech (or of the press) includes publications (and nude materials), so the materials or publications at issue were items which plaintiff has a right to and when said policy stopped or deprived him from aquiring or possessing them - without cause - this was a violation, because without any due process plaintiffs' right(s) to have said items/materials cannot be legitimately renunciated.

44.    In addition, the law - i.e., Va. Code $\S\S$ 53.1-10 (12) and 18.2-372 (under which O.P. 803.2 was enacted and enforced) provides those charged with enforcing them with an explicit and ascertainable standard(s) in order to prevent its enforcement in an arbitrary manner, (see above at #43), however, agent (A) enacted and enforces said policy—which bans all materials with nudity— thus violating the spirit of said statutes (without any just cause), i.e., none of the materials plaintiff sought to obtain (or possess) had any of the above violations (or statutory bar(s)/restrictions) in them.

45.    Second: The WRSP administration provides some general population ("G.P.") pod(s) at the prison with microwave ovens (i.e., about 4 pods, out of 18 pods) whilst the other G.P pods are deprived of this privilege without any justification(s). —All of the G.P. inmates are allowed to buy microwaveable food items from the prisons commissary, and the occasional access securepak (or other outside venders), but the water available from the cells sink is insufficient to properly or safely prepare and cook said food items, (i.e., it's not hot enough).

-22-

46.    Upon information and belief, agents (C),(D),(E)(F), (G), and (H) are responsible for authorizing said privileges to the pods at WRSP, and they have intentionally allowed only ▇ some pods to have access to a microwave oven(s) whilst depriving inmates in the other G.P pods of said privilege.— This official policy or practice is an unconstitutional behavior, which violates the equal protection and due process clause of the U.S, constitution, (and also amount to a cruel and unusual punishment), i.e., although having access to the microwave ovens is a privilege, the action of said agents in not providing that to all the inmates in G.P at WRSP is clearly a violation.

47.    In addition, inmates have no access to alternative means (officially) to prepare or cook said food products, i.e, in addition, to the cells hot water being insufficient, there is no hot water pot in the pod for inmates to access,— And upon plaintiffs presenting these issues to the above indicated agents, their response is always that the matter will be looked into, but the issue(s) still persist.

48.    Third: VDOC and/or WRSP officials, i.e, agents (A),(B), (C),(D),(E), and (F), authorizes inmates in general population ("G.P.") who are or have been 12 or 18 months (and more) charge free, to purchase from an outside vender (several times a year) food and other items which aren't normally available from the prisons commissary, however other inmates are punished by being prevented from buying said items because they haven't been charge free within ▇ a set time limit(s).

-23-

49.        Institutional charges (with-in the VDOC) like those used to justify the above actions are regulated by operating procedure 861.1, offender discipline ('O.P.861.1'), and under said policy, ①officials are allowed to impose only one penalty within the penalty range... For each violation, ②there isn't any provision(s) that allows officials to punish inmates by not allowing them to obtain said privilege(s), and ③no enhanced, extra-legal sanctions is allowed (or at least not without proper notice), Thus the above is a violation which also come about, because the inmates being deprived haven't been issued with any disciplinary offense report(s) and afforded a disciplinary hearing and appeal of such a decision (i.e., a penalty not to let a inmate order said items)

50.        Upon plaintiff presenting said issues to ▇ agents (C), (D), (E), and (G), They always respond that they are only acting in accordance to the mandates of agents (A) and (B), however, plaintiff has a contract expectancy; state created liberty interest and/or due process right(s) to the administra-tive procedure(s) listed in O.P. 861.1 before being deprived of said privileges, So said deprivations or violations is unlawful.

51.        **Fourth**: WRSP officials unlawfully deprive inmates of their personal property (i.e., food, hygeine, and other items) during routine pod recreation (rec) shake/pat downs, — Plaintiff submits that prison staff have a regular practice/procedure of shaking-down the pod during pod rec, (i.e., inmates are lined-up and patted down, plus other items — like shower stuff, ▇▇▇ (cell/pod) trash cans; and etc — in the pod are searched), but during most of these events, items such as food, hygeine, and

-24-

etc, are taken from inmates persons or property which staff never return nor issue any confiscation/infraction forms for, instead said officials keep these items for their own use/consumption. — Inmates who complain about these actions are subjected to recrimination or reprisal.

52.        In addition, when ever inmates are placed in segregation; from general population, VDOC policy requires that their personal property be inventoried - and they be present for the process - however, WRSP staff conduct said inventories in the absence of inmates (so they can steal items) and coerce them via, threats and otherwise, into signing said forms. — Upon information or observation and belief, staff eat said food items and/or they end up trading or paying inmate-informants off with them, (or inmate hit-man).

53.        Plaintiff, contends that said practices are unlawful. Where officials are taking inmates personal property without providing any due process. — And upon said issues being presented to building supervisors and agents(c),(D),(E) and (F), their response is that the matters would be looked into, but said violation(s) still persist at WRSP.

54.        Fifth: The conditions in segregation are erosive, drastic and constitute cruel and unusual punishment on various levels, i.e., ⒶFreezing cold cell temperatures prison officials (some) frankly admited is exerted as a method of punishment, Ⓑrights being treated as privileges, i.e., to avoid what officers feel is "to much" work officials speed walk pass inmates cells upon taking a shower, (outside) recreation, phone call, or cell cleaning list

and a majority of inmates are deprived of such rights as officers intentionally either take the list just prior to 6:00 a.m, count, not turning the pod lights on or blowing the whistle or requiring inmates to stand for count or even demanding that they do - as is normally done in general population. - The fact of the matter is that showers, recreation, and cell cleaning are rights not privileges, such rights should be reasonably afforded via, reasonable opportunity, as a direct result basic human needs of exercise and sanitation, showers are involuntarily forfeited per WRSP orientation handbook (offender) and practices, ©meals are fed within a 6 and ½ hour time frame resulting in physical and psychological torture as well as rapid weight loss. — Plaintiff submits that said practices are arbitrary and in violation of the 5th, 8th and 14th amendments to the U.S. Constitution, plus they can be construed as deliberate indifference, and that when they were presented to agents (E),(D),(E), and the buildings supervisors their responses was that it would be looked into, however said violations still persist at the prison.

55.        Sixth: WRSP officials arbitrarily discourages inmates from communicating with (or talking to) each other, ie., while out in the pod for recreation. Staff always threaten inmates with summary deprivation/forfeiture of their recreation; being sent to segregation; or receiving an institutional charge, if they are observed communicating with other inmates still in their cells - or who are on the opposite tier - however, there is no issue when it is done at other locations (e.g, while in the cell - or from it - and in the dinning hall and etc), thus violating Plaintiffs rights.

-26-

56.     **Seventh:** WRSP prohibits as much human contact during visitation as possible. Inmates are required their one hug upon initiation of the visit, over a counter as well as upon completion. Inmates are not allowed to hug their loved ones during photos (being) taken at visitation, & are limited to 3 photos, of chest level and higher up. These arbitrary restrictions discourage visitors from driving nine or more hours to visit their loved ones thats incarcerated, thus violating Plaintiffs rights.

57.     **Eighth:** WRSP officials deploy unlawful practices during annual reviews in order to deny inmates a lower good time awards (GCA) and security level classification. In particular, They fail (for retaliatory and other reasons) to take account and recognize inmates reasonable efforts to achieve their annual goals - which if considered, would enhance their custody or security and GCA level status.

58.     Per VDOC O.P. 830.3, V-D (3-a), inmates shouldn't be penalized for the unavailability of educational, vocational, work, or programs opportunities, (if they can demonstrate or document consistent, reasonable efforts to achieve said goals), however, said officials - like agent (J) and other Unit managers in retaliation or otherwise - hold it against most inmates and refuse them their points for any efforts put forth, (plus they state that it's per agent (I)'s mandate which is that if a inmate isn't actually enrolled - compared to being on a waiting list - for said activities, (nor on the pay roll for a job), They can not be allotted any points.

59.     In addition, prison officials wrongfully consider past

-27-

and other conducts of inmates in making their security classification decision(s), i.e., the prior offense history and etc — these actions (including those presented above) leads to inmates receiving unfavorable GCA and security level points that "subjects" them to punitive, high security classifications and prevents them from receiving a earlier release date - from prison - and/or a transfer to a lower security level thus violating rights guaranteed by the 5th, 8th and 14th amendments to the U.S., constitution and state law, (plus they can also be construed as deliberate indifference). — Plaintiff submit that upon said issues being presented to agents (C)(D) (E) and (G), their response was that it would be looked into, however, said violations still persist at the prison.

60.        Ninth: In late 2016 and early 2017 WRSP officials took coffe mugs/cups and bowls from inmates in general population and upon inquiring as to why these items were being taken officials stated that it was per the directions of agents (A)(B), and (C), and that replacements would be distributed soon, (presumably as was done months earlier when inmates tumbler cups was taken) however, after several complaints and grievances on the issue(s) - and it's been over a year - no replacement coffee mugs have been provided to inmates.

61.            In addition, though some inmates have received replacement 25 oz bowls, others have been requesting for months for theirs but have yet to receive anything, thus the above action violates rights guaranteed by the 5th, 8th, and 14th amendments to the U.S., constitution.

-28-

62.   **Tenth:** WRSP staff intentionally and regularly lose or circumvent inmates outgoing (and sometime incoming) mail, i.e., Plaintiff - and other inmates similarly situated at the prison - have had issues with their mail (legal and regular; complaints, grievances, requests, and disciplinary forms, etc) not reaching their destinations due to pod officers who pick them up - and deliver them from or to the pods and cells - not doing their jobs, and/or officials responsible for processing them (i.e., in security, the mailroom, or the destination intended at the prison) simply discarding them. - These practices, prevent inmates at the prison from receiving some services, & having issues addressed.

63.   In addition, on march 21, 2017 agent(c) issued a memo, (presumably, with the approval of agents ▮, (A) and (B)) which required that all incoming inmate(s) correspondence would be photo copied in black and white, and said copies would be delivered, thus, in place of clearly visible and durable colored photographs, officials are providing black & white photo copies that are barely visible and on low grade paper - which inconveniences inmates with a long sentence because they don't last - however officials have no issue printing or providing colored durable inmate(s) pictures during visitations and pod photo events, - plus, when ever outgoing mail is returned by ▮ the post office for any reason, prison officials refuse to deliver them, but instead forces inmates to pay for them to be remailed or they get destroyed, (thus, amounting to destruction of intellectual property). - Thus, the above fails to provide inmates with constitutionally adequate access to their mail, and upon presenting these issues to building supervisor & agents(c),(D),(E),(F),(G),(H),&(5), they failed to address them, causing a violation of rights guaranteed by the 1st, 5th, 8th, and 14th amendments of the U.S. Constitution.

-29-

64.      Finally: after plaintiff and other inmates reported the above violations—which showed that rights and privilages were deprived and such deprivation ▮was pursuant to a pattern/practice of resistance to the enjoyment of them — to said agents and other higher ups—their verbal and informal complaints went without exhaustion, (and even circumvented by agent(G)(H)(I), and others (See Count - VII & VIII).

## COUNT IV—RELIGIOUS RIGHTS VIOLATIONS

65.      VDOC and/or WRSP officials—through policy, practice and otherwise—have violated plaintiff (and other inmates) state plus federal constitutional rights to 'equal protection; to freely exercise ones religion, without any discrimination or unwanted burden(s), and to be free from cruel and unusual punishment.

66.      First: WRSP is authorized by VDOC policy—O.P. 841.3— and agents(A), and(B) to allow inmates in general population the opportunity to practice their religion together (i.e, their weekly worship services, study groups, and etc) without any significant limitations. however, agents (c)(D),(E)(F),(G)(H),(F) & who-ever is acting as the watch-commander for the religious service day(s) at issue have taken it upon them selves to restrict said services by only allowing inmates in a certain or particular building to attend services by them-selves, i.e., dividing the services by only letting building - A, B, and C inmates attend services with other inmates in their particular building(s). Thus burdening plaintiffs religious practices (because there isn't a (one) person designated to teach the islamic faith or give

—30—

Friday's sermon prayer (Jumuah) as required by his religious beliefs)—Plus, there is no documented (or otherwise justifiable) reason(s) for said limitation(s), e.g., threat(s) to the safety of persons involved, or that said activity disrupts order in the facility, ° etc.

67.       The only exception that's occasionally allowed—by said agents—is that once every few month(s), whenever a qualified or recognized religious representative/volunteer's are available to come to the prison to minister to the inmates (normally, under the super-vision of the prison chaplain or an official), and whenever a special religious holy-day accrues, all the inmates of a particular religion—regardless of the building they are being housed in—are allowed to attend at the same time together. (note: said practices have now been limited for all religious programs, except for Christian/Kiros services (religious)). — In addition, inmates in general population-buildings A, B, and C - who are enrolled in school and/or vocation are allowed to attend together at the support building from monday(s) to thursday(s) without any hardships and/or incidents, so it cannot be claimed or said - by VDOC/WRSP officials - that the same accomodations can't be afforded or extended for religious services.

68.       Second: currently, the VDOC allowes inmates - via., their policies or otherwise - to have access to 4 or 5 christian (religious) cable channals or stations (in addition to 15 or 17 regular channals), and visitations - plus other exceptions - during any of the major christian Holy days, however, no such courtesy or exceptions are afforded to other religions officially recognized within the VDOC, i.e., requests for islamic (religious) channal(s) and personal visitation(s) from family and friends for/during the Eid-ul-Fitr

and Adha' Feasts or Celebrations are denied, (even for special purpose visit requests), Thus, Plaintiffs Rights are being Violated.

69.     Third: Plaintiff (who is a muslim.) contend that his religious Practices are being burdened because he is not allowed to pray in the pod or outside during recreation, nor wear his Kufi(s) when-ever he want. — The VDOC policy - O.P.8413 - That regulates inmates religious programs (or matters) sets forth guidelines which Violates religious activites/Protocols (and ~~    ~~ Plaintiffs rights) by imposing a substantial burden on his religious exercise to wear his religious Kufi at all time which would give him the right to exercise his belief, i.e., the policy states "Kufi's are approved for possession by male offenders, they must be worn in the same manner, time, location, ~~    ~~ circumstances - as non - religious head coverings." (e.g., in the call or outside).... The Kufi is a part of plaintiffs identity, and it represents his religious belief, Further, There is a difference between a kufi and a non-religious covet, — The Kufi does not conceal (or prevent anyone from Viewing) a inmates head, as with a baseball cap or skull cap, — Plus, it can not be claimed that a Kufi can be used to conceal contraband because inmate can carry contraband within the "pockets" of their shirt(s) or pant(s) they wear at all times (or otherwise), and an official can ask to search any item (or an inmate) at any time.

70.     In addition, Services are provided in a designated area under some supervision outside the pod (and supervision is also provided during pod and outside recreation, — When it's available -). A muslim offers prayer Five(s) times - or more - a day,

-32-

and during those time(s) of Prayer, Plaintiff could be at rec.,
and prayer must be made. However, officials refuse to allow
inmates - who are muslims - to offer there prayer during recreation
(citeing O.P. 841.3), thus, violating his right(s), and although some
muslims elect to return to there cell(s) to offer the prayer in
a timely manner, Prison procedure, Practice/Staff do not allow
them to come back to resume recreation, thus unlawfully
depriving them of rights and Privileges (e.g., exercise, and access
to shower, telephon, kiosk, and etc). Plus, although the Christian
Faith (members) sit's at the table to pray, a Sunni muslim can-
not pray in an upright possition (i.e., orthodox/Sunni muslims
must offer prayer by kneeling, bowing, prostrating and
etc... by them-self or in a group).

71.     **Fourth:** WRSP is not Following VDOC Policy - O.P. 841.3 -
which requires a "in-room officer at all times" during religious
services and consequently plaintiff - who is a Sunni muslims -
fears for his safety. ⁓ Agents (C),(D),(E),(F),(G), and (H)/(P),
are not acting in accordance with O.P. 841.3 IV-(A)(7)(b), which
states, "Security level 4 and 5 Facilities SHALL have in-room DOC
staff supervision (security staff or counselor) or a contracted
facility chaplain when available, at all times, whether or not
volunteers are present, so because there's no official present (in the
room) during any religious services held at WRSP, this puts inmates
safty in jeopardy.

72.      In addition, although there isn't any official
stationed inside each chow hall or gym (on the floor), There is an
officer at the tower(s)/booth(s) post, (who are not on the floor), - Plus

-33-

officials never make any rounds (in the rooms) once inmates are inside those locations for services,— and though said officer(s) job is not only to look at the inmates within said locations, their attention is occupied by their primary duty, i.e., looking outside on the yard at inmates at recreation; opening and closing security gates; monitoring movement on the walkway  ; manning the gun; and etc; thus, these conditions/situations causes plaintiff and the sunni muslim(s) community to be **vulnerable** and stressed because while at service(s), when the prayer is being offered, believers are face down (prostration) in the presence of non-muslims inmates who attend said programe(s) to learn about the religion (or who might be there with unknown motives), so the presence of an official in the room would deter any unruly conduct(s) from visitors.

73.        **Fifth:** VDOC and WRSP policy/procedure of charging inmates money - about 70¢ per meal- for (supposedly) accepting a meal tray (between dawn and sunset) during the month of ramadan, violates the due process and takings clause of the U.S. Constitution, i.e., where said policy or memo authorized the deductions (or removal) of funds from inmates accounts for meal trays received during Ramadan (the day time), but officials didn't notify inmates of said policy, memo, or billing process/system (which should have required inmates explicit authorization befor meal trays was given and money taken) this violated said constitutional rights. —In addition, plaintiff submit that the process is severly flawed to the point that inmates who didn't get a tray during the day (or some who were'nt on the Ramadan list) were unlawfully charged for trays. Thus, said conducts or action is unlawful and needs to be addressed.

-34-

74.        Sixth: The prison has been authorized by VDOC policy — O.P. 841.3 — to allow inmates an opportunity to participate in any religious service(s) of their chossing, without any significant limites (or hinderance), i.e., equal access to religious services, however, alot of inmates at the prison have been denied participation in religious services (Primarily the Sunni. islamic programs activites on wednesdays and fridays), because the WRSP orientation manual, plus agents (c), (D), (E), (F), (G), (H), and (P) have limited the amount of individuals on said programs list to about 86 or 88 inmates at a time (without any exceptions), — and there is no legitimate reasons - i.e., space, resources, security, safety, and etc - that warrants or justifies said action.

75.        In addition, some inmates have tried for months (and some times years) to get on the list for the sunni islamic program services — in order to perform some of their obligated religious duties, but without any success, however most times or years these same inmates are allowed to participate in the yearly fasting of 'Ramadan,' — if they aren't otherwise obstructed; — and a simple review of the list for inmates who performed ramadan in just one and a half building(s) at the prison will show that their - muslims - number's far exceeds the 88-inmate limit set by said agents (note: there are 4-buildings at the prison).

76.        Upon information and belief of Plaintiff — and other inmates at the prison who are similarly situated — WRSP officials are intentionally circumventing the efforts of some inmates to get on the sunni islamic programs list in order to discorage them from participating or practicing in their religion. (and they have even been known to summary and unlawfully remove inmates of the list for said religion, with out any

−35−

justification) Thus, the above actions violates VDOC policy and The '1st, 8th, and 14th amendment of the U.S. Constitution.'

78.      **Seventh:** Plaintiff contends that his religious practices are being burdened because he is not allowed to access the bathroom, a sink, & a sanitary place to cleanse himself before/during his religious services in accordance with his religious beliefs, i.e., when the call for service is pronounced by the prison, he (or any other Sunni muslim) could be at recreation, in other-wards not in his cell. However, a muslim can only offer prayer if he is clean and pure (al-wudhu), and this is not allowed to him when the service is held in the chow-hall, — additionally, he alleges that inmates attending other religious services in the gum are allowed such privileges, thus in turn violating the equal protection clause. Upon plaintiff presenting said issue(s) to agent (C),(D),(E),(F),(G),(H) and (P) they failed to address the matter.

79.      **Addendum:** It should also be noted/considered that as a result of said separation(s) (see above #66 & 67) their has been unorthodox innovations and descention amongst the Sunni muslim (religious) practition- ers, e.g., in sunni islam it is required that a knowledgeable individual lead in religious practices or services (i.e., Jumm'ah khut ba/sermon; and Salat/prayer, plus taleem courses), however, since outside representatives are only available every once in awhile the convenient course of action has been to select a qualified individual from amongst attending practitioners, but due to some extraneous housing situations that person (and other most knowledgeable inmates) is being housed in same building, and as a result less or un-qualified individuals have been left to minister to/in the other 2-buildings, and this has caused the aforementioned issues', thus, burdening plaintiff religious practices.

-36-

80.     **Finally:** Upon the above violations being communicated to said agents (and other officials at WRSP) they were **ignored** and other attempts to have the issues looked into and addressed - **by** other higher up's - went without exhaustion, and most times circumvented by agents (G)(H)(I)(W) & other (see Count - VII and VIII).

## COUNT V - DENIAL OF LEGAL ACCESS

81.     Plaintiff contends that several practices of WRSP officials systematically deprived him (and other inmates similarly situated at the prison) of access to legal means, materials/resources and assistance.

82.     **First:** It takes - on average - about a year for most inmates at the prison to obtain a meeting with the institutional attorney to seek legal counsel. Plus, attempts to contact or communicate with said attorney - via, the mail - to ask for legal advise (and authorities that aren't available from the WRSP Law Library) have never been responded to.

83.     Upon said issue(s) being presented to agents (C)(D)(E)(G) (Q) & (H) in 2016, 2017 and 2018 their response was that's "just how it is at Wallens Ridge," and the institutional attorney - upon being seen - has stated that he has no control of the scheduling at the prison and that said agents were responsible for that, (Plus, that he had been instructed - by them - not to respond to any letters from inmates at the prison unless given the go ahead by them. Thus, inmates at WRSP ▆▆▆▆▆▆ are being deprived of legal access, and other rights by the unlawful conducts - presented above - of said agents, which also violates the constitution and other law(s).

-37-

84. **Second**: Legal information and research is being obstructed or impeded by the law library at WRSP because: ①-inmates are not allowed to shepardiz case laws (and other authorities)—nor can they conduct legal word(s) and/or phrase(s) searches; ②inmates are not permitted access to writing manuals, some forms, general "how-to" guides for the lay person, plus legal practice and procedur manuals or treatise, and ③ it takes 3-weeks or more—on average—to provid requested legal materials." —— These deprivations was/are intentionally perpetrated by WRSP officials (i.e., agents(C),(D),(E),(G),(H),É(Q)) to circumvent the legal pursuit(s) of inmates at the prison.-

85. **Third**: the process to obtain legal copies-of essential documents-is flawed in some instances, i.e., if there's an emergency or a insisting court deadline, (some) officials still require inmates to submit a copies request form, into the business office and upon that departments approval the copies are-then-made or provided, (and said process takes 2 to 3 weeks). —— Nor do officials allow inmates to purchase or possess any carbon paper(s)-in order to ease their hardship(s) of obtaining photo-copies,-thus, these practices violates the rights of inmates at the prison.

86. **Finally**: Plaintiff. submit that as a result of those conducts his litigation efforts were adversely affected or prejudiced, (see count-VIII for details),—And due to plaintiffs' current housing or security level- and the prison limiting free (inmate) movements- he is not allowed to physically attend or access the law library, however, since the main purpose of the prisons legal facilites is to provide access to the courts through the

-38-

availability of legal materials from the law library and/or adequate assistance from the Law Library and/or adequate assistance from persons trained in the law and these means or resources are currently inadequate and/or being denied at the prison - due to no fault of the inmates - and when those issues were presented to the aformentioned agents, Plus agents (I), (J),(N) and other higher ups - Via, verbal and informal complaints- they went without exhaustion, (and even circumvented by agent (G),(H),(J)(N) & others See Count - VII and VIII) This violates plaintiffs rights.

## COUNT VI - DENIAL OF DUE PROCESS

87       Plaintiff - and other inmates similarly situated - submit that VDOC and WRSP officials via., policies, procedures and actions violate due process rights related to the disciplinary procedure, i.e., Institutional hearings officers (IHO) and others intentionally and improperly curtail(s) the presentation of exculpatory evidence and arguments by: ① preventing inmates good-faith request(s) for documents, witness statements, review of video camera footages, and etc, from being processed or considered, (e.g., evidence which are dispositive items of proof, are critical to the defense, are supposed to be in the custody of prison officials, and could be produced without impairing institutional concerns); ② not allowing inmates - who are mostly un/ill-educated - to fully present their points, issues or defense during disciplinary hearings, (e.g., fast-talking the proceeding/process in order to gup inmates, etc); and ③ not being impartial, plus relying on false or unsubstantiated positions to convict & issue(ing) illegal penalties.

-39-

88.     As a result of said practices - in the VDOC/WRSP - inmates simply choose the penalty offer(s) that's presented with the charge(s) because it's known that their side of the story won't be seriously considered by the Fact-Finder's, — and in most cases those IHO's are aware of the fact that said charges were issued in retaliation (or other unlawful reasons) and in aid of it they deploy unfair and distasteful tactics (prior to or at the hearing) to help said corrupt agendas.

89.     Finally: Upon the above violations - by agents (0-1), (02) and others - were presented to agents (C), (D), (E), and other higher up's via, verbally, informal complaints, and disciplinary appeals, they went without exhaustion (and even circumvented by agents (G), (H), (J) and (N)), thus, violating the rights of inmates within the VDOC or at WRSP.


COUNT VII - DENIAL OF/TO THE GRIEVANCE PROCESS

90.     Plaintiff reallege and incorporate by reference paragraphs 2 to 160 and Count VIII - in support of his contention(s) that the grievance system does not operate according to the rules on paper, i.e., his efforts to seek redress of (or remedies for) most of said issues - presented herein and others - in order to prevent (personal) loss or harm, were discouraged, mishandled, and circumvented by staff at WRSP and ~~other~~ officials within the VDOC and these actions or conducts demonstrated an act of deliberate indifference towards the protected rights of plaintiffs' O.P. 861.1 — Protected by the constitution of the United States and Virginia, plus the code of VA, § 53.1-10; § 8.01-243.2; Boc 6 VAC 15-31-180,300, and ACA standards 4-4234, 4-4344, 4-4394 (REF. 3-4271) That is the

-40-

authority For O.P. 866.1, of which grants to plaintiff the right to secure institutional services or resolve complaints and receive fair -prompt- decisions, plus actions in response to his grievances, — In support, Plaintiff. Submits that:

91.      First: To utilize the provisions that are made for responding to incidents, situations, or conditions which may subject inmates to personal loss or harm -WRSP officials require that - inmates must verbally communicate their issues to a designated staff and if the matter is not resolved then a standardized 'informal complaint form' must be provided in order to afford an opportunity to pursue the issue further, (O.P. 866.1-V (A-1)). — Agents (J)(K)(L)(M)(N)&(S) - plus other unit managers, lieutenants, and sergeants-have secured at the prison a position which has as part of their duty or job-description the requirement of addressing verbal complaints from inmates and providing them with informal complaint forms if they are not satisfied with the resolution(s) said officials provide.

92.      Plaintiff - and other inmates similarly situated— has had (several) incidents or situations where he was subjected to personal loss and/or harm (see counts I to VIII), and his attempts to utilize the informal process to address them were circumvented by WRSP staff, i.e., upon presenting his verbal complaints to designated staff or said agents (because WRSP does not make informal complaint forms readily available to inmates) their regular response that's provided are/was "we'll look into it, and get back to you; talk to me later; that's not a serious issue," and similar stall-reply/tactics, plus when requests for informal complaint forms are made (because of dissatisfaction

-41-

With their response or resolutions), said staff would generally say "there's none in the building; you'll get it later; remind me later; etc, and if the requester persists they are subjected to threats, ~~———~~ harassments, reprisals and etc., — most or some issues that plaintiff was able to procure complaint forms for was by buying (or trading) them from other inmates who might have some, (via., they brought them from the previous prison(s) they come from, or otherwise).

93.     Second, agents (G),(H),(N) and others-have secured at the prison a position which has as part of their job-description a responsibility to address and/or log incoming requests and complaints (plus over-looking the whole grievance process at WRSP) concerning issues from inmates, to include plaintiff. Within standards of VDOC O.P.866.1, however, when he does complete and submit them to the grievance dept, (via., the prisons mail system), there's never any receipt, response, or indication that they were received by that dept., (For most of them, plus, sometimes they just keep coming back without being filed, nor any indication as to why they were being returned, & any further resubmitions just go missing. .—When request forms are sent to said agents asking for informal complaints and inquiring about the above tactics they are either not responded to, or forwarded to a unit manager who in turn never responds. Upon information and belief plaintiff submit that the institution is under investigation by several departments and agencies for countless of unlawful actions or practices, so the above tactics - and others- are deployed (and encouraged by WRSP administration (i.e., agents (C),(D),(E),(F),(G),(H),(N), and others) in order to prevent VDOC

-42-

heads or higher ups in richmond; The ronoke regional administration, and other agencies or dept (s), From reviewing Said (or any) incidents or Violations.

94.        The agents mentioned herein - and other WRSP staff - deliberately Violated o.p.866.1-V (and WRSP intake or orientation memo or handbook) by their above and other actions which effectively prevents inmates attempt(s) to create a paper trail, thus Violating Said rights previously listed, and proving That the Facts herein presented (above) clearly shows That there is no adequate inmate grievance procedure that allows inmates to communicate their issues or complaints without reprisal(s), i.e., lost employment, incomplete meals, mailing disruptions, and etc.

95.        Finally: Plaintiff Contends that the Conducts of Said agent(s) - as described above - in denying him access to The grievance process (and to petition officials For redress of issues) protected by the 1st and 14th amendment to the U.S. Constitution was a Violation, — and that the purpose of O.p.866.1 Under State law is:

    Section-IV(m); once The Subject matter is applicable
                to grievability with a/that Criteria, -(then);
    Section-VI(B); Takes effect with intake of individual
                grievable issues. -(and);
    Section-IV(N); Is important because of what the purpose
                of This Section entails "REMEDIES"!

So Since (in Fact) grievable issues were ignored by Said agents - and some times circumvented by them - how were any remedies available? — When the opportunity to present an issue is or was thwarted or renunciated.

-43-

96.          Under the U.S. Constitution Freedom of Speech includes written material(s) (e.g., grievances, etc), so the issues raised therein were Freedom of Speech, which plaintiff has a right to and when said agents stopped or deprived him from using available procedures or remedies (or placed a barrier on the grievance process)-without authorization or just cause-this was a Violation because without any Due process plaintiff's right to Freedom of Speech cannot be legitimately renounciated.

97.          The proclamation of beliefs that are derogatory to public institutions or officers (or even private individuals) may properly be restricted to suitable occasions, Good causes, and justifiable ends. However, a petition (e.g., grievances or otherwise) on a proper occasion with proper motives for justifiable ends is a privileged publication, therefore the right to petition (e.g., grievance) in a peaceful manner and for legitimate objects is a civil right and this right is not limited to those only Qualified to vote, but equally by those entitled to the protection of the law.—Though most of the complaints on the issues in this application went unexhausted (and circumvented sometimes) said Violation(s) should not go unaddressed.

### COUNT VIII - RETALIATION BY OFFICIALS

98.          Plaintiff contends that the notoriously corrupt WRSP does not recognize nor respect any inmate's rights. It's deeply ingrained culture of corruption, racism and abuse, compels secrecy and engenders retaliatory impulses against those who seek to expose them, via., Maintaining a list of/for

-44-

inmates who challenge their unlawfull practices, (i.e., the power of the pen) which is then circulated among staff at the prison in order for some amongst them - who might be interested in sadistic/torturous conduct - to know which inmates to single out for reprisal.

99.   In/About early 2016, when plaintiff arrived at WRSP he had some difficatty obtaining informal complaint forms to pursue several constitutional (and other) violations at the prison (and within the VDOC) that he - and other inmates - was being subjected to, (see count - VII).

100.   At first Plaintiff submitted request forms (in) to agents (c), (E), (G), and (N) about the problemes but only agent (N) would sometimes respond and occasionally she would send one/two (1/2) complaint form(s), but by mid/late 2016 she stopped sending said forms and instead referred him to his building supervisor(s), - who in turn would not respond to (or address) them. — In addition, Plaintiff presented said complaints/issues - verbally - to the buildings supervisor (e.g., agents (J), (K), (L), (Q), and others), but he was met with the tactics presented above at paragraphs 91 to 93 (most of the time) so he proceeded to enlist - the help of - other inmates to bring attention to (and address) some of the issues in the above counts.

101.   Although most of the informal complaints submitted by plaintiff - and other inmates - on the above issues and others were bought from recent arrival inmate to WRSP (or those who make a hustle out of selling said forms - due to the restrictions at WRSP), staff/ agents within said department kept circumventing them by not filing the majority of them in order to keep the number of complaints on issues at the prison low.

-45-

102.     Due to this Plaintiff submits that he began writing (out) some pamphlets, newsletters, or bulletins which lay out said issues of the prison and set out formats on how to challenge or pursue them through the VDOC grievance process, - and for this WRSP officials (who were mostly in collusion to keep the amount of complaints/grievances down at the prison - and otherwise) retaliated against Plaintiff - by adding him to said list — in order to maintain the status Quo.

103.     In late july to early September 2016, Plaintiff submitted Several verbal complaints in to agent (G),(J) & other building supervisors, - due to said limitations at the prison - about: (a) The numerous ways recreation was being unlawfully deprived (see above at count - 2), (b) not being allowed any toothbrush holders at WRSP (see above at #33), (c) being fraudulently deprived of personal property upon arriving at WRSP (see above at #38), (d) not being allowed access to a microwave oven like some pods/inmates at WRSP, (see above at #45 to 47); & (e) not being allowed to talk to inmates on another tier during pod rec (see above at #55), — however, upon plaintiff's request for an informal complaint (from those officials) to pursue said issues further, he was meet with the aforementioned circumvention tactics; & agent (G) even told him a few times; "keep it up, you will end up on a short list you don't wana be on." (i.e., WRSP hit list)... "or wont like."

104.     The months that followed saw plaintiff re-newing the above issues (at #103) & distributing his pamphlets/bulletins; plus pursuing the following: (a) not having a safe way to get to or from the top bunk, (see above at #15 to 17); (b) The erected fences on the yard preventing him from accessing the water fountain (or any other water), (see above at #21 to 22); (c) being subjected to constant cell illumination, (see above at #34 (d) being unlawfully forced to lay in contaminated water naked (see above #37);

; ⓒ being unlawfully deprived of publication(s), (see above at #43 to 44); ⓔ - officials deploy(ing) unlawful practices during annual review(s), (see above at #57 to 59); ⓕ officials unlawfully taking coffee mug/cup and a bowl from plaintiff, (see above at #60 and 61); ⓗ being denied legal access, (see above at Count-V); and ⓘ being denied due process during disciplinary process at WRSP, (see Count-VI).

105.     For pursuing said issues (and others) agent(s) ⨸ (J) had Plaintiff retaliated against, e.g., on/about March 24, 2017 when Plaintiff and a Mr. Neely (plus other inmates) were in the pod (B-1) waiting to exit for religious service, they shook hand(s) and agent(T) - who was in the control booth stated " the next time I see yall touch each other am going to write you up," when Plaintiff asked what he ment by that agent(T) stated " Yall've been told Wallens Ridge does not allow any touching."

106.     After this exchange Plaintiff approached some supervisors (to include agent(s) - who's office was on the way out of the building) and presented the issue/exchange to them, and the next day on March 25, 2017 agent(T) filed a false charge of tempering with security materials, devices, or equipment against plaintiff, — upon information and belief, plaintiff submits that said supervisors (to include agent(s)) informed agent(T) of his verbal complaint and had him take adverse action against plaintiff for said complaint, and others he had been presenting or pursuing around that time, (see #104).

107.     On the date in Question - March 25, 2017, - while Plaintiff was standing near the stairs (and waiting for one of the showers to come open) he bent down/over to get his shower stuff (i.e., soap, cloths, towel, shampoo, deodorant, and etc), but his

—47—

J.P.S—player (which was in his top shirt poket) fell out and when he went to recover it he inadvertantly let some of his shower items—that was in his hand(s)—go, and some ended up rolling under the stairs, (plus, some went over the pod's red line), while plaintiff was recovering said items agent (T) who was in the control. booth yelled at him to stop out of the pod, (i.e., into the vestibule).

108.      While there, agent (T) asked plaintiff what he was doing under the stairs and plaintiff related the above occurence to him, agent (T) then responded "so you, went over the red line and opened a slot"?, to this plaintiff said no—he only reached over to get his stuff which had rolled over there, agent (T) then directed him to return to his cell, (and he also said that plaintiff's recreation was being taken till he decides otherwise). — The next day—on march 26, 2017— said charge was executed/served on plaintiff accusing him of violating O.P. 861.1, and during the whole process plaintiff's due process rights was violated.

109.      For the case of WRSP-2017-0459, plaintiff was deprived of evidence in/at said hearing. — On march 26, 2017, plaintiff turned in 2-documentory evidence forms, (one for the camara footage of said incident and the other for any documentation that he was ever apprised of the new disciplinary policy, i.e., 861.1). At the april 12, 2017 hearing, when plaintiff brought up the issue of not being provided with his requested evidence, agent (62) stated that he didn't get them and that he doesn't belive plaintiff submitted any forms in. — The forms were meant to help plaintiff present a valid and meaningful defense (and they would have, — see below at paragraphs *116 to 111 ), thus policy was violated, i.e., O.P. 861.1—

-48-

XIV (A-2 and 3), Plus, plaintiff's due process rights under the U.S.
Constitution was denied.

110.        At said hearing, Plaintiff asked for the Video Camera
Footage of the incident to be reviewed in order to prove that no
tray-slot was opened by him, (because agent(T) statement was in
contradiction to Plaintiff's, position), however, agent (O-2), refused
the request without any valid reasons, thus denying him access to
said exculpatory evidence (which was a dispositive-item- of
proof, was critical to his defense, was in the custody of WRSP
officials, and it could have been produced/reviewed without
impairing institutional concerns), and this was-an- abuse of
discretion which deprived him of due process, because said VDOC
policy is not allowed to require inmates to convince the fact
Finder (e.g., the IHO/agents(O-1) §(O-2)), of their innocence before they
are allowed to present exculpatory evidence, i.e., under the U.S.,
constitution, there isn't supposed to be that (or any) kind of gate-
keeping mechanism in place (to let an inmate access essential
evidence for his defense), Plus, this deprivation clearly doomed
plaintiff's position, defense, or case.

111.        The IHO/agent(O-2), convicted Plaintiff based on no
evidence, where agent (T) claimed that he opened a tray-slot but
Plaintiff appeared at the hearing and denied this claim, (Plus, agent
(O2), wasn't an objective and impartial decision maker because he
failed to produce/review the camera footage of said incident),
thus there was a lack of any evidence - presented at the
hearing- to support a finding of guilt, as due process requires.
So there has been a violation. — In addition, the part of VDOC

-49-

policy - O.P. 861.1 - which deprives a inmate of an advisor, witnesses and documentary evidence if they fail to respond or indicate a preference (while the DoR is being served) clearly violates due process because silence does not - in any way or form - imply consent. — nor should plaintiff have been proceeded against (or penalized) under a policy - i.e., 861.1 - That he was never appraised of.

112.       Plaintiff was again retaliated against by agent (J) who called him to his office some time in **late april**, 2017, under the guise of talking about the grievance regarding his annual review (re: WRSP-17-REG-00155 — which was inproperly conducted due to the mandates of agent (I) — see **above at #57-59)** but upon getting to his office, plaintiff was surrounded by agent (I) and several of his cronies (i.e., staff and/or supervisors) and he displayed a stake of complaints and request forms that plaintiff had been submitting to get filed - for months - which were never processed (or which were circumvented) and stated, "Orori, I'm tired of your shit, if you do not withdraw this grievance and stop sending all these forms in, you are going to get dealt with," — When plaintiff declined said advance, agent (J) instructed a counselor 'S.A. Caughron' (who was present or in his presence) to reclassify plaintiff in an unfavorable manner, and to keep him/it that way as long as he is in his building, thus plaintiff was subjected to a unfavorable reclassification soon there-after and all the months he was housed in said building, when his review came up.

113.       Around said time period, plaintiff had an exchange with agent (Q) - who was in the pod (B-1) delivering some law library or legal materials - where he made some of his regular inquiry(s), i.e., why couldn't he shepardize any case laws or obtain a case-finder on a word(s) or phrase(s); why couldn't he access any of the law books (of significance)

-50-

From his department; why it takes so long to confer/communicate with the institutional attorney; and etc.

114.        Agent (Q) response was "better slow down around here with those kinds of talk ofori, you know young, ▬ stallard, and some others already got you on one of these lists they got going around here." Although plaintiff was thrown aback by this he responded that all he was trying to do was properly litigate several issues he had pending in his criminal cases, and some proceedings he had instituted against Sussex II State prison.

115.        At this, agent (Q) informed him that his hands where tied as to the materials he could make available to inmates due to some limitations put into place by agents (C), (E), (G), and (via. advanced by) the attorney generals office, and that all he does is collect the list for inmates who want to see the institutional attorney then forwards them to agent (G) to handle the scheduleling and/or appointment(s). (note: plaintiff submitts that he was inclined to believe agent (Q) statement because in late 2016 and/or early 2017—while agent (G) was conducting one of her rounds or when she was helping serve food/tray's during one of the prisons Quarterly lock-downs,—he advanced all of the issues he was having with accessing legal means at the prison (see above at count-V) and the fact that his complaints on said issues—and others— was being circumvented. Agent (G) stated that one of the prisons modus operandi was to suppress inmates like plaintiff litigation efforts [against the VDOC], so if plaintiff wanted to get off of WRSP or didn't want to get hurt, he should abandon those/his efforts).

116.        WRSP officials didn't relent in their adverse actions against plaintiff for his complaints against issues,—On May 11, 2017,

-51-

Plaintiff was again called into agent(J) office to address some of his complaint(s) or submissions about his religious rights being violated, e.g., not being allowed to worship together; not being allowed to pray in the pod or outside, not wear his kufi at any time; not having a 'in room officer at all times during services; being prevented from attending services; and etc. (see above at Count-IV). While being escorted (by a c/o who plaintiff had never seen) from his cell/pod to the office, said official stated "you better play ball when we get in here or else I'm going to tell everyone in your pod that you're a child molester," (note: even in prison, some crimes - such as molesting a child - are frowned upon; and those found to be perpetrators are subjected to being brutally assaulted (sexually or otherwise) extorted; plus other degradation(s) and abuses from inmates and prison official(s).

117.        As a result of said threat, when agent(s) demanded that plaintiff withdrawal his complaint about officials in the pod not opening his cell to let him attend his religious services, (and officials at the services intentionally turning him back for no reason(s), he complied out of fear - in the presence of several officials (supervisors, officers, and an investigator) - and because agent(s) stated they would stop, (re: complaint tracking # 17-INF-00982).

118.        The targeting-by WRSP officials-still continued. Plaintiff submits that he has several (severe) food allergies (i.e., carrot, bean, green pea, onion, pumpkin, shellfish, tomato, and white potato), and that food service officials always put food items he's not supposed to eat on his tray (in an attempt to cause him harm). — Upon information and belief agent(R) is related to agent(J), and she is the supervisor for

-52-

The kitchen at WRSP, thus plaintiff submits' that said harmful actions From her department - directed toward him - is being perpetrated to aid agent(s)'s retaliatory agenda against Plaintiff.

119.     Plaintiff's issues always takes place when ever tray(s) are being served in the pod. Most of the time, food items he's not supposed to eat can be visibly seen on his tray. So officers serving the food will take it back to get it fixed, (if they aren't agitated by the situation); on other occasions said food items are discretely disguised and mixed in with food Plaintiff can eat - in an attempt to poison him - and this has caused him alot of harm - since 2016 - which most times officials refuse to call medical for him for (or sign of on his emergency grievances about said matter), - As a result of this (and other issues, see above at #36 & 118) plaintiff does not eat most of the tray(s) that's provided to him which looks suspicious and tampered with - or contaminated - and either goes without food, or when he can afford it, he survives on commissary items/food.

120.     Despite submitting countless of complaints (and other) forms in on said issues only a few have ever been processed (e.g, grie., # WRSP-16-REG-00293; WRSP-17-REG-00200 and 00204). — On one occasion, in early 2017, Plaintiff began to complain to agent(R) about the fact that his cholesterol levels might be high/up (unhealthily), due to her subjecting him to a perpetual diet, because all her kitchen or department was providing (for the main course of a meal) over 88% of the time - in substitution(s) - for his allergy tray(s)/diet was egg(s) (or boiled eggs). I.E., 3-boiled eggs was being provided for lunch and dinner, - about 5 to 6 days out of a week - and when you factor in the days that eggs are also served for breakfast (which is about 4-days) This makes a

-53-

recipe for disaster (and/or subjects plaintiff to a inadequate diet).

121.      In response, the kitchen/agent(R) began to send plaintiff beans on his tray(s) again, and when he demanded that the issue be address, on may 5, 2017, agent(S) came to plaintiffs' cell and said "both Stallards' got you on their list, [i.e., the targeting or retaliatory list(s)] So either you take the beans tray or you don't eat today, and if we hear about this shit again you are going to the hole." ⸺ Plaintiff responded that he would take the tray (because he was going to give it to his cellmate instead of letting it go to wasint) however, agent(S) never provided him with a tray, and plaintiff believes that he did this in aid of agent(S) and (R)'s agenda.

122.      Plaintiff is still subjected to said deprivations till this day, e.g., in the beginning of 2017's Ramadan. Plaintiff had several inmates in the pod with him join in on complaining about agent(X) depriving them of in pod recreation, (or limiting it to 20/23 minutes), Upon information and belief, said officials who those complaints was presented to (i.e., agent(S), and other building supervisors) didn't just circumvent them, they also informed agent(X) of all the inmates submitting said complaints so he could silence them, So on june 14, 2017 when the ramadan night tray(s) was being passed out and plaintiff pointed out to the officer serving the tray(s) that there where several food items on his tray that he was allergic to, Said officer called up to the control booth to agent(X), and told him to order plaintiff another tray, and he responded that he would, however, no tray was ever provided to plaintiff that night, nor was his verbal complaint to agent(J) about the matter ever addressed (and he wouldn't give him a informal complaint form to pursue the matter). Upon information and belief agent(X) is related to agents(S) and (R) So

-54-

said adverse action(s)/conduct(s) (and others unmentioned here) was to aid his and their retaliatory agenda, (Note: agent (X), who works the night shift, was also known to circumvent inmates outgoing mail —in B-building— on behalf of agent (J), and other officials).

123.        Prison officials owed Plaintiff a duty of care to keep track of his personal property while in their care and control. — On 11-29-2016, Plaintiff's beard trimmers was confiscated and placed in storage, but due to the fact that he didn't have any other electronics for which he needed his rechargeable batteries and charger (for), they were also taken and placed in storage, (Note: Plaintiff filed a grievance on the matter and it was addressed in priev., WRSP-16-REG-00724). On 4-19-2017, Plaintiff bought and recieved a hand held radio for which he needed his batteries and charger for, so he asked the building sargant, lieutenant, and agent (J) if they could retrieve said items for him and they returned stating that personal property officials said that those items couldn't be located/found in storage.

124.        Plaintiff attempted to pursue the issue via an informal complaint, but agent (S-1) response was that "Property does not have your batteries or charger," —and when Plaintiff turned in a regular grievance on the issue on june 12, and 15, 2017, he received a response on june 14/16, 2017 from agent (N), who declined to file/log said application because she reasoned that he was requesting for services, —Upon information and belief the above actions of said agents was done to deprive Plaintiff of his personal property in retaliation for the complaints and grievances he had/was submitting, at the time, on several issues/violations at the prison, (see above count-I to VIII), — an appeal to the regional office was unsuccessful.

—55—

125.      To aid their conspiracy with regard(s) to numerous retaliatory actions/purposes, agents (J) and (L) had plaintiff and his cellmate relocated—to a lockdown pod—from B1-pod to B6-pod, (in about mid 2017), in an attempt to also prevent him from stopping at their office—everytime the pod was let out—to complain about numerous of issues, such as those mentioned above at #103 and 104, plus: The PREA statute(s)/provisions being violated (see above at #18 to 20); unsafeness of randomly assigning cellmates at WRSP, (see above at #23 to 25); the unsafe conditions deprivation of rec., causes, (see above at #26 and 27); some issues with the cell causing conflicts, (see above at #28 and 29); the practice of singling inmates (who write up issues) out for retaliation, (see above at #30 to 32); VDOC/WRSP allows a system wide practice which denies inmates of medical care, (see above at #35); being forced to get on the ground—while one is in the shower—when the gun goes off, (see above at #37); officers cross-contaminating inmates cells during walk-through shake downs, (see above at #39); being deprived of buying an access pack, due to charges, (see above at #48 to 50); inmates being denied/deprived of their personal property during pod shake-downs, (see above at #51 to 53); conditions in segregation being erosive and drastic, (see above at #54); unlawful deprivations during visitations at the prison (see above at #56); mail being unlawfully circumvented, (see above at #62 to 63); religious rights violations, (see above at #65 to 80); and denial of the grievance process, (see above at count-VIII).

126.      On Oct 21, 2017 (at about 10:40 p.m.), Plaintiff had an accident while getting down from the top bunk (as a result of there not being any step ladder) which resulted in him stepping on one side of his (pair of) earbuds and it caused some wire to be exposed, plus when

—56—

Plaintiff was standing near the sink inspecting the damage, he inadvertently dropped it into some water. After he retrieved the earbuds and cleaned them off, Plaintiff hanged them over the bottom vent (by putting some or half of the wire in the vent-hole(s)- so it could stay up there) to dry out. Because mail had already been picked up for the day plaintiff couldn't send out a request form to the personal property dept., to ask that they come get and confiscate the earbuds that was damaged.

127.       The next morning officers entered the pod to conduct a shake-down (of the pod), and Plaintiff's cell was one of the first to be searched, and while officials were in the cell agent (w-i) took/pulled the earbuds out/off the vent and asked "who's are these", so Plaintiff claimed ownership and one of the other officers present (who normally works the yard) stated, commented, or asked "you're the guy who's allergic to everything huh?" and when Plaintiff didn't respond agent (w-i) stated "I heard he also likes writing everything up." They completed the search and put plaintiff and his celly back in the cell, only to come back moments later -with agent(L)- and pulled them back out of the cell and searched it again (while agent(L) was asking Plaintiff questions like did you help your celly with that complaint about his player; where do you get your complaint forms from; and etc).—After that an officer came to Plaintiffs cell - a few hours latter - and served him a possession of a contraband charge, (in case # WRSP-VR-2017-1315).

128.       Plaintiff contends that he shouldn't have been proceeded against (nor penalized) under a policy - O.P.861.1 - that he wasn't apprised of prior to the charge being served on him, i.e., he was never provided with a copy of the new O.P.861.1 policy when it was passed out in late 2015 (note: officers who were passing them out never gave him

-57-

a copy because they claimed that they ran out, & they would have to come back later with more), nor was he asked to sign any documents as was required of the other inmates who did receive a copy (also a copy of O.P. 861.1 was served on plaintiff on 8-24-2017, but said charge ~~XXX~~ had already been issued on 8-22-2017).

129.        Policy or practice wasn't followed in said case, where prior to the hearing he submitted 2-applications for production of evidence (on 8-22/24-2017) to assist his defense, i.e., plaintiff requested for a copy of the form that all inmates are required to sign for upon being issued the O.P. 861.1 policy and a officer response form which presented several essental and viable questions to the reporting officer (e.g., what kind of wire was found, didn't agent(L) re-enter the cell with said wire and conduct another search, and etc), — But agent(e-2), when asked by plaintiff -prior to the hearing- 'what happened to said application, stated "I didn't get it [i.e., The officer response form] So don't bother bringing it up during the hearing or else," and thus he denied access to said evidence which was a dispositive (or an exculpatory) item of proof, so this was an abuse of discretion which deprived plaintiff of due process. (Plus, said agent also convicted plaintiff based on no evidence).

130.        WRSP officials further retaliated against plaintiff by trying to make his living situations with his cellmates dificult, via., targeting them both and blaming it on plaintiff. — i.e., with the approval/consent of agents (J), (L) and other higher up's agent (v-1), and (u-1) retaliated, (with a ~~regular~~ assist from agents (u-2) and (v-2)), in about mid November, 2017 on plaintiff & Mr. Pisacane by conducting a search of their cell (B6-14), and took a weight/water bag

-58-

and some other items but no contraband was found, however, said agents unlawfully and summarily punished them by coming to their door - later on - and saying "if yall come out of the cell today, I'll punch you in the face," and thus they were placed on cell-restriction and not allowed to come out for a shower nor pod/outside rec., — plus Mr. Pisacane was issued a fabricated charge by agent (u-i), who told him it was courtesy of plaintiff, — Agent (J) and (u-i) again retaliated against plaintiff on Nov 27, 2017 when they conducted an extensive search of his cell again (in the morning), and though no items of contraband was found, same time after - between 10:50 to 11:00 a.m., - agent (u-i) came to their cell-door and said "yall are on cell restriction for a few day(s), if yall come out am going to put a shank on yall and have you sent to the hole." Being in fear, plaintiff on his cellmate didn't come out of the cell, however, later that day (at about 1:43 p.m - Nov 27, 2017) when Mr. Pisacane was taken into (the) B6-pods office for a disciplinary hearing — on the aforementioned false charge— he informed the IHO (agent (0-2)) on the recording of the charge of the fact that said agents had put him and plaintiff on cell restriction for said charge and in retaliation for complaints being turned in on them (and other issues), but agent (0-2) brushed the contention(s) off and attempted to prevent it from entering the record, — Agent (J) and (L) finally just had Mr. Pisacane moved to another pod in an attempt to silence him.

131.        In continuing with their adverse actions, on dec 21, 2017, agents (J) and (L) had agent (V-i) extract plaintiff out of his cell under the guise that agent (J) and (L) wanted to see him in their office about some of his complaints, and while plaintiff was on the other-side of the building she searched his cell and didn't uncover any contraband. Indeed, there was no contraband in the cell. But, while conducting the

-59-

search agent (V-1) told Mr. Stephens - who was plaintiffs cell-mate, and present, - "I see you don't have that much paperwork like your cellmate, so don't get like him while you're in here," Mr. Stephens asked what she ment and informed her that he just got to the prison the day before. Agent (V-1) told him that Plaintiff (and his associates) were problem prisoners who were in "deep shit or trouble" with the prisons administration for getting others to complain - with him/them - about issues at the prison, and that if Mr. Stephens knew what was good for him he would tell her what (or everything) plaintiff was up to. When Mr. Stephens declined to say anything (and pointed out again that he just got to the prison), agent (V-1) threatened him with being issued a charge, getting sent to the hole, and being beaten up. — After Plaintiff returned to the cell, Mr. Stephens told him of the exchange he had with agent (V-1), and Plaintiff was later issue a false charge by agent (V-1) which he was successful in getting it dismissed (in case # WRSP-2017-1959), for technical reasons, upon information and belief, said charge was also issued in retaliation to aid agents (5) and (L).

132.      In 2016 - around the time plaintiff arrived at WRSP - Plaintiff submitted requests (in) asking to talk to the institutional attorney (i.e. Mr. I. Thadieu Harris, III) to obtain some needed assistance with; @ Filing a second/late writ of habeas corpus - per the Martinez v. Ryan, (2012) U.S. Supreme Ct., ruling; @ pursuing an appeal in Terry K. Ofori - V- Comm., of. VA, (case No. 68 8; @ maintaining tort filings/application(s) to the Circuit Court of Sussex County in early 2016 (or Terry K. Ofori - V - Comm., of VA, et al, case No. CL 17-3); plus it's appeal to the Supreme Court of VA, Record No.170888; @ pursuing a civil action in Terry K. Ofori, - V - Harold W. Clarke, case No.

-60-

2:17-cv-242; and (8) he was being Frustrated/impeded from pursuing a motion to Vacate in Case No. FE-1999-96842, 96843 and regarding the fact that the Charging instruments and/or judgment orders were Void. — Due to the fact that most of Plaintiff's personal legal materials was/went lost when he was transferred from Sussex II State prison, and the Law Library at WRSP was illequiped or not providing needed/requested items.(See above at #81 to 86, and 113 to 115)

133.        However, by january, 2017, Plaintiff, had not seen said attorney nor did he receive any response back to his letters asking about the above issues listed above - he had - and dispite submitting several requests to the WRSP Law Library trying to find-out what the problem was (because he saw other inmates Conferring with Mr. Harris - less then a handfull of times), there was never any response(s) issued (except for one in jan 2017).

134.        Plaintiff was finally able to seek counsel from Mr. Harris on May 21, 2017, but by that time he had received (almost all negative or Unfavorable results from his -unaided- pursuit of the above matters because he lacked the code of law. — An attempt to obtain more help from Mr. Harris by resubmitting to see him again on/about may 21, 22, 2017 - and sending him some letters or inQuiry - didn't bear any results till nov 17, 2017, and because he did not get all of the info or help. from him, Plaintiff again submitted another request to speak with the institutional-attorney on nov 28, 2017 and as to date/now (sept. of 2018/oct, 2019) he has yet to see one.

135.        On Feb 6, 2017, during a Quarterly Shack-down, Plaintiff's bowl and coffee mug/cup was Confiscated by officials who claimed said items were no longer allowed at WRSP. So on Feb 7, 2017 he

-61-

Filed an appeal on the matter where he pointed out that the coffee mug(s)/cup(s) should be replaced (as was done several months earlier when the tumbler(s) were taken from inmates), and the bowl(s) be stored till he gets transferred. A response was issued by agent (C) on march 22, 2017 (in griev., # WRSP-17-REG-00052) where it was claimed that replacement items (or bowls and cups) were being ordered and will be distributed upon arrival. — Not being satisfied with said response plaintiff filed an appeal to higher ups, but they upheld the institutions position, However, about a year latter plaintiff noticed that some inmates in his pod had the new 25. ounce bowls (plus he saw the new commissary list which had said items listed), so he approched some building supervisors (ie, agents (J) and (M)) and asked when he would be provided with a new coffee mug/cup and bowl, their respons was that there wouldn't be any replacement coffee cups, but that he send in/them a request form and they would get him a bowl. After a couple of weeks went by where plaintiff submitted several request forms (in) to said agents (and kept reminding them of the matter everytime he saw them) but there was no response being given, so he proceeded to buy a informal complaint form from a inmate (because said building supervisors wouldn't give it to him - upon request) and filed it on the issue on jan 24/26, 2018 (in applic, tracking # WRSP-18-INF-00206).

136.       Plaintiff submits that upon information and belief agent (J) and (M) denied him a bowl in retaliation for complaints he had been submitting on issues at the prison. (see above at # 103, 104, and 125). Shortly after said form was filed agent (M) stopped at plaintiffs cell - during his rounds - and stated that they

-62-

had received his complaint and that if plaintiff (would) agree to withdraw it he would get him a bowl. Plaintiff pointed out (to him) that his complaint was dealing with both the bowl plus coffee mug/cup, and agent(M) responded that 'per the decree of higher up's (i.e., agents (A),(B),(D),(E), and (F)) only one cup was to be replaced (even if two were taken, e.g., if a tumbler and a coffee cup was taken-from a inmate-only one of them was to be replaced -within the VDOC- and inmates would have to buy the other) So since plaintiff already had a replacement tumbler he couldn't get a replacement coffee cup/mug for the one that was taken. — Plaintiff declined agent(M)'s offer, to withdraw the complaint and he stated "if you don't withdraw it I'll make you regret it latter," but plaintiff stood his ground so agent(M) left his door/cell.

137.     Shortly after agent(J) issued a response to the complaint on/about Feb 21, 2018 Falsly claiming that he had instructed [mr.otori] to see him about obtaining a bowl. Plaintiff contends that he recognized this as (being) a stall-tactic (by said officials) so he submitted a grievance in on the matter and pointed out that he had already requested (for) a bowl and mug/cup but officials failed to respond. Agent(N)-however- joined in on the conspiracy (as usual) and refused to file/log the grievance and (instead) ▓▓▓▓ claimed that plaintiff was requesting for services. An attempt to seek review from the decision was unsuccessful.

138.     On Feb 23, 2018, agent(M) kept true to his threats (see above at #136) and issued a fabricated or trumped up charge against plaintiff, and mr. stephans, in retaliation, (note: other inmates were found in possession of similer items, but were not charged)

on said date, after the cell (B6-14) had been searched - during an annual shake down - and both occupants of the cell was returned to it, again (I) and (M) came to the door and stated "I bet - yall will drop those complaints now," Plaintiff (who didn't hear everything they said) went to the door and asked what was going on, agent (M) showed him a small piece of a "surge protector and coax cable cord (which were hollow, or didn't have any wire in them) and asked who they belonged to, Plaintiff claimed ownership and explained that he used them as shower heads, later charges was issued for him & his cellmate.

139.     Plaintiff submits that he plead guilty to said charge (in case # WRSP-2018-0259) - to also try and help his cell-mate out with his charge because he knew nothing of those items in question - but upon appealing his conviction to agent (D), on a procedural error and retaliation grounds, said agent violated due process by not being impartial in his findings (i.e., failed to correct / address obvious violations in the administrative process / record). - Besides his retaliation claim, Plaintiff contended in his appeal that o.p. 861.1-X, A (6-b) [which provides that the OIC should not process the disciplinary offense report,... if they are a witness to the offense"], was violated, i.e., agent (J) - who was the OIC for said charge - and a officer was present at the X-ray machine and thus a witness to said items of contraband being found, as claimed in the charge, (and said form(s) or evidence was introduced in both Plaintiff and his cellmates case), however, agent (D), took said facts and unilaterally concluded or stated that "there was no evidence that Unit manager Stallord was aware at the time your mattress had contraband in it. Mr. Stallords presence at the X-Ray machine did not mean he know your mattress specifically

-64-

had a problem," — appeal response dated March 26, 2018 — obviously one can see that agent(D)'s position was in contradiction of the evidence, — plus, demonstrates that he was partial in his review of the case, thus violating due process.

140.      In late Feb or early March 2018, while B6-pod was being swiched out with C6-pod, plaintiff witnessed agent(I), passing the retaliation baton onto agent(k), i.e., prior to leaving out of B6-pod plaintiff saw one of the white inmates in B6-4/5 ask agent(I) for a bowl, and said agent left the pod and came back — about — 3-minuts later with a bowl that he handed to the inmate. — A few moments later when agent(I) walked by plaintiff's cell (B6-14) he asked if he was ever going to get one of those bowls, and agent(I) responded, "not if I have anything to say about it." — Some minutes later, while entering C6-pod, plaintiff witnessed agent(I) pointing at him while talking to agent(k), and when plaintiff got closer to them agent(I) told agent(k), "make sure Ofori does not get away with anything in this building."

141.      On March 23, 2018, plaintiff was again singled out and targeted — in retaliation — for his complaints and grievances he had submitted on issues at the prison. On said date the entire C6-pod was being search(ed) by officials, and agent(W2) conducted a shake-down of plaintiff and while he was dressing (i.e., putting his socks back on) agent(W2) stated that he thought he saw something so he called a ~~sergeant~~ sergeant McCray and they both searched him again — and during it agent(k) and a Sergeant Ferguson joined them, i.e., they took turns looking through the window, at no time did anyone (else) claim that they saw ~~anything~~ anything — after plaintiff and his cell-

-65-

mate were hand cuffed, officials then took them out of the cell
and to a metal-detector (at the front of the pod), upon getting
back he observed agent(K),(W-2), and Sergeant McCray standing
(between cell C6-13 and C6-14) in a circle with a sock(s) and
extracting items out of it. — At no time did any official ask
plaintiff or his cellmate who said item(s) belong(ed) to. but after
the search was completed, Sergeant McCray came to plaintiff's
cell and served him a possession of contraband charge, (and said
charge had agent(K) as the OIC). Upon information and belief,
plaintiff submit(s) that said items was planted — while he or his
cellmate was not present — by those agent(s) present in order to
advance their retaliatory agenda(s) against him.

142.        Due to the fact that official(s) who act in the capacity
as OIC and serving officers" have some fact finding authority, (for the
OIC), and are required to serve as advisors (for a serving officer), O.P.-
861.1-XA(6-b) and XI B(12) requires that they not be a witness to the
offense at issue, in order to prevent due process from being violated, i.e.,
said officials can not be expected to be impartial if they saw (or
where a part of) the incident that led to said charge, (or it's investiga-
tion). — Plaintiff submit(s) that upon presenting the above issues or
defense at the april 2, 2018 hearing (plus the fact that he was never
asked — nor did he admit any guilt — if said items of contraband
belong to him), in case # WRSP-2018-0479, agent(6-1) flat-out denied
their validity and refused a request for the video camera footage
of the incident to be reviewed to clarify weather said aformentioned
officials witnessed the occurrence or issue — since agent(W-2) didn't
make that fact clear in his officer response form — nor did agent

−66−

(a-l), approve plaintiffs' request for said item(s) to be inspected by the fact finder to determine if they were in fact contraband, thus exculpatory evidence was denied in the case which resulted in a violation of due process. In addition, plaintiff attempted to present said issues on appeal to ~~agent~~ (D) but was unsuccessful.

143.        In march and april 2018, plaintiff (plus other inmates in C6-pod) submitted several complaints in to agent (K) and other building supervisors about issues in the pod that violated their constitutional rights, i.e.;

① Being deprived of pod recreation (via, officials only allowed about 1½ hours) on march 7, 11, 17, 18, 19, 26, 27, 2018, and April 1, 3, 5, 10, 11, 12, 13, 2018.

② Being deprived of outside recreation/exercise on march 12, 27, 2018, and april 2, 2018.

③ Being deprived of personal property (food and other items) by officers searching inmates during pod recreation on march 9, 2018, and April 2, 11/16, 2018.

④ The pod was put on lock-down and shook-down for no legitimate reason on march 21/22, 2018.

⑤ Informal complaints (forms) was submitted on most of the above occurrences but majority of them was circumvented by WRSP officials, (see count-Ⅶ), and attempts to present said issues verbally to agents (F), (H) ~~( ) ( ) ( )~~ and other supervisors — with agent (D), (E), and other officers ~~in~~ present or in tow — during their rounds, was unsuccessful, on march 14, 2018, (at about 11:30 a.m); march 20, 2018 (at about 11:48 a.m); and april 13, 2018 (at about lunch-time).

and as a result officials targeted and retaliated against him (and some of the other inmates) e.g., On April 19, 2018 agent (x2) and (x3) conducted a search of plaintiff cell while he was present but his celly (Mr. Stephens) was not, about 5-minuets into the search Mr. Stephens walked to the cell and asked if his presence was needed and agent (x3) said " we got who we came here for so no, — right around that time agent (x2) asked plaintiff " what is this?" while holding up a pair of earbuds wrapped in some tissue, when plaintiff answered him he then leaned over and whispered something to agent (x2), and moments later they both exited the cell with a pillow case full of items he couldn't see and told him to pack his property because he was going to the hole. Although no items of contraband was found, said agents issued fabricated charges against him - with a headnod from agent (k) - and had him sent/placed in segregation.

144.     Plaintiff submits that, agent (x2) falsely charged him with a 'Possession of Contraband' infraction and, agent (x3) issued a false charge of 'Possession of intoxicants'. Prior to (and at) the hearing for said charges plaintiff's due process rights were violated - by several officials - in case # WRSP-2018-0735 and 2740, i.e., Plaintiff asked that said items he was being accused of possessing be produced so the fact finder - agent (o-2) - may inspect them because no such items was taken from him/his cell, and/or said false charges were issued in retaliation - without any evidence in support - (plus, he also contended that a proceedural error occured in the process/case(s) because the officer who served said charges was a witness to the event or search. In addition, he requested that the video camera footage of the incident be reviewed to confirm or discredit his position),

-68-

however, agent(az), deployed his usual circumvention tactics (see Count-VI) and joined in on the conspiracy by not being impartial, and he denied the above requested exculpatory evidence. — An attempt to seek an appeal (from agent( )) was also unsuccessful.

145.        In addition, when plaintiff was taken to Segregation - in the morning - on april 19, 2018 he packed all of his property and delivered them to the C6-pod's office, where agent(Y-2) and (Y-3) conducted an inventory of his personal property (without him being present - and agent(K) was in that office about the same time) plus at about 2:00 p.m., agent(Y-2) appeared at plaintiffs cell in Segregation to deliver some of the personal property he was allowed to have. At first agent(Y-2) demanded that Plaintiff sign off on said inventory form(s), but he declined and told him that he wasn't signing any form(s) till he could check it to confirm it's accuracy, — Upon doing so plaintiff pointed out some discrepancies to him and agent(Y-2) assured him that any items not in his bags he was about to get was most likely in his bags/box which were sent to personal property Storage so he could write for them to be returned. After plaintiff received his property bags and looked through them he discovered that several items was missing, i.e., ⓐ some legal documents (about 5,988 pages); ⓑ 5-books (a 5-Vol. Set of American jurisprudence, 2d); ⓒ a pair of shower shoes; ⓓ a pair of eye glasses; ⓔ some personal and commercial photos (about 400 of them); ⓕ Several hygiene items (4-Frankincense oil; 2-Fish oil w/omega 3, 1-cotton swabs, 3-Advance Ultrex Vitamin, 3-1a Day Multi-Vitimin, 1-generic Zantac, 2-Fruit FLV Antacid, 4-Flosser, 8-Sensodyne toothpast, 3-Suave X-Relief lotion, 2-gold bond powder, 2-A&D Ointment, 3-medicated tar shampoo, and 16-Power up deodorant).

-69-

146.      When plaintiff was released from Segregation on april 27, 2018 a c/o/ms. Gibson brought him his personal property that was placed in Storage, and upon inspection it he discovered that with an exception of his Shower Shoes and Some hygeine items the rest of the above listed items weren't being returned, so he informed her of the issue and she informed him that 'she sees these inadvertences' on the part of officers' all the time so to go ahead and sign of on the inventory form and she would contact agent (Y-2), (Y-3) and the proper officials' to have his property looked for and returned. Plaintiff went along with her suggestion, but later that day - while he was in front of the building (C) - c/o gibson called out to agent (Y-2) who was in the control booth of c-4,5,6 said and informed him of plaintiffs' issue (or missing property) and agent (Y-2) responded/stated 'who that guy hey bud, you got what you was going to get so that's' that."

147      Plaintiff had alredy Submitted a complaint in on the issue on april 19, 2018, (tracking # WRSP-18-INF-06890) and a response was returned on/about april 23, 2018 which failed to address the problem, so he attached a regular grievance to it - which set for the above events - and mailed it to the grievance department (via, the prisons mail System), but after 1½ weeks had passed without any receipt being issued for said grievance plaintiff sent a barrage of request forms to the grievance dept., trying to find out what was going on with his application, but there was never any response, — Upon information and belief plaintiff Submits that agents (Y-2), (Y-3) & (K) intentionally took or discarded said-above listed-personal property, and that agent (N) (and other officials) joined in on the conspiracy by circumventing his efforts to have the matter addressed through the grievance process.

-70-

148.        In addition, Plaintiff submits that agent (K) and other officials at the prison used the fact that there wasn't any official means to determine whether a inmate received a meal tray between dawn and sunset during the religious fast of Ramadan to defraud inmates who were observing it (and even others who weren't) of their money from their inmate account, i.e., Upon information and belief plaintiff (and other inmates) was charged money for meal tray(s) he never received - in retaliation for his complaints about issues - and when he submitted complaints and grievances in on said unlawful conducts, officials further retaliated against him by having his cell regularly searched, plus he was threaten(ed) with physical harm, and etc., — though some complaints and grievances was processed about said issue (e.g., Plaintiff's was considered under grievance No: WRSP-18-REG-00218), most were circumvented on all levels of review. Upon information and belief, agent (K-1) had plaintiff marked down as receiving tray(s) during ramadan (in order for him to be charged) in retaliation for complaints that plaintiff submitted against him for subjecting him to the following violations: ⓐ takeing plaintiff's (and other inmates in the pod) recreation summarily; ⓑ regularly stopping by the shower while plaintiff (or other inmates he does not like) is washing up and looking him up and down while makeing lewd comments about body parts; ⓒ throwing plaintiff's toothbrush(s) away during walk through shake-downs, plus, useing the same gloves for all of the cell's for said shake-down; ⓓ depriveing plaintiff of several personal property items during line-up shake-downs of the pod during pod rec.; and ⓔ intentionally not opening plaintiff's (and other muslim inmates in the pod) door to let him attend religious programs; — plus other violations not presented here. — And this clearly showes the unlawful nature of said practic(s) at the prison.

-71-                            _ADDENDUM_

149.        Plaintiff submits that his initial attempt to send the complaint (in this case) out for filing was circumvented by WRSP officials — I.E., on/about Sept 30, 2018, Plaintiff turned in said complaint (which was in a sealed envelope) into one of the buildings supervisors to be sent or mailed out — via, legal postage withdrawal request and certified mail return receipt — to the U.S. district court in Roanoke, VA. After several weeks had passed without any indication that the prison had sent said mail off, Plaintiff began making some inquiry(s) but when the responses he was receive(ing) wasn't making any sense to him, he commenced an informal complaint on the matter on/about nov 13, 2018.

150.        On nov 19, 2018, Plaintiff was called to the prison's investigators office where said mail was returned back to him in an envelope that had been opened — outside of his presence — (note: it was returned due to a mistake in the address). Upon inquiring as to why his mail was opened outside of his presence, the investigators told Plaintiff that "that's how it was from the mailroom," and when he inspected the contents he discovered that several documents were missing (i.e., sworn affidavits and declarations from a few inmates, plus undersigned forms with signatures accumulated from a substantial amount of inmates in A and D building at the prison).

151.        Plaintiff turned in some informal complaints in on the issues (in application # WRSP-18-INF-03149 and 03264) and responses was issued that failed to properly address the matter(s), so he followed up with regular grievances where he contended that upon information and belief WRSP officials intentionally held said mail and opened it in order to (steal documents or) circumvent (his) litigation efforts, however agent(N) undermined them by returning it on nov 26, and 29, 2018 with the reasons or statement(s) does not affect [you] personally, and non-grievable; matters

-72-

beyond the control of the DoC," — Plaintiff submits that an attempt to appeal said decision to the regional office -in Roanoke, VA- was unsuccessful, and thus effectively circumventing his access to the grievance process.

152.　　In addition, plaintiff submit(s) that agent(E) and (S) retaliated against him (and other inmates who were involved in said litigation or in the pod) by haveing officials issue false charge(s) against him, i.e., on nov 21, 2018 said agents entered C1-pod to look into a issue (security related) with one of the cells, and they both conducted rounds or inspections in the pod (agent (S) on both tiers, and agent(E) only on the top tier), and during said rounds they both inspected cells visually and if anyone of them was not in compliance it was addressed on the spot, (e.g., they told inmates what to correct in the cell or to hand over any -visable- items of contraband and etc). Said agent's did not require any corrections from plaintiff's cell, -although they did make some comments that sugested they had intimate knowledge about his efforts to have said action mailed out -, which occurred between/about 8:00 a.m. to 9:33 a.m.

153.　　At about said time two officials (a sergeant Fergason and agent(Z)) were also conducting a -visual- security check of the cells in the pod, while they were on the bottom teir agent(S) talked to them and pointed, indicated/beacon toward several cells - to include plaintiffs- and moments later (while they were climbing the stairs towards cell 44)agent(E) stoped them and directly pointed at plaintiff while talking to them. — Upon information and belief, plaintiff submit(s) that agent(E) and (S) instructed those officials to issue fabricated charges against him, due to the action he was sending out to be filed and/or his complaints on issues at the prison.

154.　　When agent (X) arrived at plaintiffs cell he conducted a

Visual check and then called the Sergent and they both looked through the cell doors window and (they) instructed him to take a piece of soap that was on the wall down, (there was no string attached to it). — note. Prior to getting to his cell (and after), plaintiff observed said officials open the tray-slots to several cells to retrive strings/items of contraband, — but this didn't occure with him because he didn't have any such items.

155.    Later that day the Sergent appeared at plaintiff's cell and served him a charge - for tempering with a security materials, devices, or eQuipment (120B) - where agent (Z) fabricated the facts and claimed that plaintiff had a line hanging in the cell with items on it obstructing the view of parts of the cell. — several inmates in the pod were also issued/served similar charges, i.e., said reports - written by agent(Z) - had a familiar cadence and wording. (case # WRSP-2018-2137 and 2138).

156.    On dec 6, 2018, Plaintiff went befor agent (6-1) for a hearing for said charge and was found guilty plus fined or penalized $6. Plaintiff submits that prior to said hearing he was approached by several officials who intimidated him with threats/retaliation if he called agent(E) as a witness in the case, (e.g., on dec 5, 2018, at about 9:50 a.m., agent(E) conducted a round in c1-pod and when plaintiff asked him when the long list to see the institutional Attorney would be addressed he looked Plaintiff up and down and scornfully said "you better do the right thing at your hearing tomorrow or else"). — In addition, Plaintiff was deprived of his due process rights during said hearing when agent(6-1) refused his reQuest for the review of the video camera footage of said incident to prove that a procedural error had occured and discredit agent(Z)'s claim that the serveing official (sgt) wasn't present at the time of the incident, plus he was denied his reQuest that said item he was accused

of distroying or possessing be inspected by the Fact-Finder befor any ruleing in the case was maid, - instead of relying only on The reporting officers (agent(s)) statement or clam(s).

157.    Due to the perpetual nature of Violations (or deprivations) of right at WRSP, Plaintiff notes the Following to support some of his claims herein presented: being Subjected to cell restriction/disciplinary lock-downs, from Nov 21, 2018 to Dec 5 and/or 9, 2018; dec 17, 2018, to (about) dec 27 - 2018; and aug 25, to 29, 2019, aug 31, 2019, Sept 1, 2, and 5, 2019, Sept 6, 2019, (re: WRSP-19-REG-00433); Religious rights Violations in march/april (re: WRSP-19-REG-00242, 00428, INF-0204, and    ); Food and medical Service(s) Violations, (re: WRSP-19-REG-00437, and 00449); unlawful deprivation of property, (re: WRSP-18-INF-03137; 19-INF-02633; and -19-REG-00448); being prevented from ordering the Virginia Food Super pak, 2019; unlawful condition of/in segregation, (re: WRSP-19-INF-02668); and other issues. — Plaintiff submits that most of his verbal complaints on said matters (and others), - plus some that he was abule to submit informal complaint forms in for - where circumvented by officials at WRSP (see above at Count - VII).

158.    Finally: In order for plaintiff to establish proof of a claim of retaliation in violation of his rights under the amendments of the U.S. Constitution, he must show (under Federal standards):

    (A). That he was engaged in an activity or conduct which he had a Constitutional right to, - i.e., protected conduct(s), - e.g., filing (or submitting) complaints, grievances, and/or Law suits in on the issues presented in the above counts, — and,

    (B). What the prison official(s) - said defendants mentioned in this action - did to plaintiff out of retaliation to stop him from pursuing said issues, i.e., adverse action, which is so

-75-

bad that it would stop him or an average person from
continuing with said protected conduct(s), e.g., see the
present court, —— and,

©. There is a 'causal connection', i.e., said defendants did what
they did because of what plaintiff was doing to get lawful remedy.
the prisons officials (or said defendants) adverse actions - as pesented
herein - was directly related to plaintiffs protected conducts and this
violates his 1st, 4th, 5th, 6th, 8th, and 14th amendment of the U.S. Constitution

_____ADDITIONAL POINTS_____

159.     Any conducts described herein by said defendants under
any VDOC operation procedure (O.P.), is proscribed by the Code of VA.§
53.1-10 as said statute is the 'authority' for all VDOC policy or rules.

160.     Plaintiff submits that any delay in the filing of this action
was due to the conduct of WRSP officials - see above paragraph(s) at #143
to 147, - i.e., the original version of this application was completed in
early april 2018 and plaintiff had intentions of sending it out/off to the
court's after obtaining some copies, but when he was placed in segregation
- in retaliation - on april 16, 2018 said officials intentionally took or lost
his personal property (which included the aforementioned application) and
after trying (unsuccessfully) for several months to have said property returned -
which prison officials circumvented - Plaintiff then commenced to reconstruc;
the application, (note: most of the documents - e.g., complaints, grievances, etc -
related to the above issues or counts went missing too, so their 'case
tracking and logging numbers have been supplied in their place, - for
most of them), thus, any delay should be excused and/or an equitable
tolling provision be allowed or applied in the case. (see also
paragraph(s) #98 to 158)

-76- IV. CLAIMS FOR RELIEF.

160.        Plaintiff reallege and incorporate by reference paragraphs #5 to 160.

161.        The actions of agents (J),(M),(Y-2),(Y-3), and other officials in taking or lossing the plaintiffs personal property (in retaliation) while in their care, custody, control and storage, i.e., while they were being searched, inventoried and replaced by them - in plaintiff absense - constituted a violation under the 4th, 5th and 14th amendment to the U.S. Constitution.

162.        The actions of agents (A),(B),(C),(D),(E),(J),(M), and other officials in failing to provide some inmates (including Plaintiff) replacement bowls, cups/mugs (that was taken) violated the 5th and 14th amendment to the U.S., Constitution.

163.        The actions of agent (B),(D),(K),(Y-1), and other officials in taking inmates (including Plaintiff) property - i.e., funds of their prison account - for meal trays they never obtained, without any notice or proof of a transaction, violated the 4th, 5th, and 14th amendment to the U.S., Constitution.

164.        The actions of agents (a),(a) and other prison officials in circumventing the VDOC disciplinary procedure and/or process, i.e., see count-VI and VIII, violated plaintiffs right(s) under the 14th amendment to the U.S., Constitution.

165.        The actions of agent (c) and (D) in failing to overturn said disciplinary convictions despit their knowledge of said unlawful conducts, violated the 14th amendment to the U.S., Constitution.

166.        The actions of said agents (as presented in Count-I, II (at the fifth) and VIII, that violates Plaintiffs (and other inmates) rights by summarily depriveing him of recreation (i.e., punishment) violates the 4th, 8th, and 14

amendment to the U.S., Constitution.

167.      The actions of said agents (as presented) in Count-II and VIII, subjects plaintiff to Unsafe Conditions, in violation of the '8th amendment to the U.S., Constitution, and amounts to deliberate indifference, plus Causes(ing) him pain, suffering, physical injury, and emotional distress. (Also Violating PREA, as well).

168.      The actions, omissions and Failures of agent (A) or (B) - as presented in Count-III (at the first) Constitutes as a deprivation of publication in violation of plaintiff's right to Freedom of speech, or the 1st amendment to the U.S., Constitution,(Plus statutory Violations).

169.      The actions, omissions, and Failures of said agents which deprived plaintiff of his rights and privileges without any due process — as presented in Count-I, III ( at the Second, Third, Fourth, Fifth, Sixth, Seventh, nineth, and tenth), Plus VIII — Violates the '4th, 5th, 8th, and 14th amendment to the U.S., Constitution, and amounts to deliberate indifference Plus Statutory Violations.

170.      The actions, omissions, and Failures of said agents - as presented in Count-II and VIII - Which Subjects(ed) Plaintiff to a hostile enviroment Violates the '8th amendment to the U.S., Constitution and amounts to deliberate indifference, Plus causes Plaintiff pain, suffering, Physical injury and emotional distress.

171.      The actions, omissions, and Failures of said agents — as presented in Count-III (at second to final), and VIII — Constitutes as a Violation of the 1st, 4th, 5th, 8th, and 14th amendment to the U.S., Constitution and amounts to deliberate indifference, Statutory Violations, Plus causes Plaintiff pain, suffering, emotional distress, and injury(s).

172.      The actions, omissions, and Failures of said agents — as

-78-

presented in Count-IV and **VIII** — Which **deprived** Plaintiff of his right to freely participate (or. ~~practice~~) In (Kommunal) religious activites of his chossing, Through Force, intimidation, harassment, WRSP/VDOC policy(s), and ect, Violates the 1st, 8th, and 14th amendment to the U.S, Constitution, plus RLUIPA and RFRA, (while causeing Plaintiff Pain and emotional distress)

173.        The actions, omissions, and **Failures** of **Said** agent — as ~~presented~~ in Count-V and **VIII** — Which deprived plaintiff of adeQuat access to legal means, materials, or reSources and assistance(s), Violates the 1st, 5th, 6th, 8th, and 14th amendment(s) to The U.S, Constitution.

174.        The actions, omissions, and Failures of agents (J), (N), and other officials — as presented in Count-VII and **VIII** — in circumventing the grievance process Through unlawful actions (or in retaliation), Violates The plaintiffs rights under the 1st, 8th and 14th amendment(s) to the U.S. Constitution, Plus amounts to deliberat indifferenc and/or Failure in ones Fiduciary duties.

175.        The actions, omissions, and Failures of Said agents — as presented in Count-VIII — in being a part of a Campaign of harassment and **Retaliation** against Plaintiff For exerciseing his right(s) to seek redress from VDOC officials, Through The use of the grievance system (or exerciseing his rights For/at disciplinary procedures) Violated Plaintiffs rights under the 1st, 8th and 14th amendment(s) to the U.S., Constitution.

176.        Plaintiff has no plain adeQuate or complete remedy at law to redress The wrongs described herein. Plaintiff has been and Will continue to be irreparably injured by the Conduct of the defendants ~~~~ Unless This Court grants the declaratory and/or injunctive relief Which plaintiff Seeks.

-79- V. RELIEF REQUESTED.

177.        WHEREFORE, Plaintiff requests that the court grant him the following relief:

A. Issue a declaration that the acts, omissions, and failures described herein violate his rights under the Constitution and laws of the United States,—and.

B. Issue an injunction ordering said agents or their subordinates to:

1. Expunge the disciplinary convictions described in this civil action from Plaintiff's institutional (or VDOC) record(s), and disgorge anything assessed under them.

2. Reinstate plaintiff's security and GCA classification to a lower level, and/or have plaintiff reclassified and transfered to a security level 3 or lower.

3. Revise the VDOC publication(s) policy to ensure that inmates (to include Plaintiff's) constitutional rights are not unlawfully deprived and/or that said policy be maid to conform to state statute.

4. Immediately revise the VDOC and/or WRSP policys, proceadures, or practices that denies or impedes legal access and means.

5. Immediately revise the VDOC and/or WRSP Policy(s), Practice(s), or procedures which deprives plaintiff of his religious rights.

6. Immediately revise the VDOC and/or WRSP grievance policy/procedure to prevent any official(s) from blatantly circumventing it (i.e., allowing inmates to submit their issues or applications in through the phone or Kiosk system(s) in the pod(s); Put into place a system that will let inmates request for video camera footages to be stored for up to 5-years, for litigation reasons, and etc).

-80-

7. Immediately institute practices or procedures which Provides inmates (to include plaintiff) at WRSP more pod recreation to afford them more chances to access the telephone, showers, and other means in the pod, thus minimizeing conflict or hostilities at the prison, (e.g., Providing 1½ hours of night pod recreation for every inmate or tier in general population; limiting any major or minor pod-or-cell- clean ups to the night shift, and etc).

8. Immediately have WRSP officials search for (and return) any personal property of Plaintiff that was unlawfully taken (or went missing) while in their care.

9. Immediately institute practices or procedures that prevents inmates within the VDOC (or at WRSP) from being subjected to group or summary punishment(s) for the (isolated) action(s) of others.

10. Immediately allow inmates in double bunk(ed) cells (in general population) to have a chair or stool to aid them with getting up and down the top bunk, (or weld a step ladder between -the far end of- the bunks).

11. Immediately allow/install hooks in the cells, to permit some kind of seperation while inmates are useing the bathroom or taking a wash up, at the prison/WRSP.

12. Immediately install proper partitions for the showers in all pods at WRSP.

13. Immediately provide inmates access to drinking water while they are on the yard for recreation or exercis at WRSP.

-81-

14. Immediately revise the VDOC/WRSP moving or housing policy, practices or procedures to adequately accommodate inmates.

15. Immediately institute practices or procedures at WRSP which prevents officials from contaminating cells during their walk-through shake downs.

16. Immediately install microwave ovens or hot water pots in all general population pods at WRSP.

17. Immediately institute practices or procedures that prevent(s) (VDOC/WRSP) officials from depriving inmates of their privileges and/or rights without any due process.

18. Immediately institute practices or procedures to prevent the erosive, drastic (and crul or unusual punishments) conditions in segregation at WRSP.

19. Immediately institute practices or procedures to prevent the dehumanization of inmates at WRSP.

20. Immediately institute policy(s), procedures, or practices that prevent VDOC or WRSP officials from denying inmates, in serious need of medical care, treatment.

21. Immediately revise the VDOC or WRSP policy(s), practices, or procedures related to the mail system to prevent any unlawful conducts/deprivations.

22. Immediately, revise WRSP policy(s) or procedures, (or institute some) to eliminate inmates being subjected to a hostile eviroment/situations.

23. Immediately revise the VDOC or WRSP food service policy to stop/prevent any cross-contamination of allergy tray(s).

-82-

C. Award monetary damages in the amount of $8,000,
against each proper agent or defendant jointly and
severally for each day Plaintiff has been or is subjected
to practices he believes are on-going violations of his
constitutional rights.

D. Award compensatory damages in the amount of
$1,000,000 against each proper agent or defendant jointly
and severally.

E. Award punitive damages in the following amount:

1. Granting Plaintiff $3,000,000 against (all or) each proper
agent or defendant jointly and severally, and/or.

2. Granting Plaintiff $16,000, against each proper agent
or defendant individually.

F. Grant any additional relief this court deems just, proper,
and equitable, (to include recovery of plaintiffs costs
in this suit).


                                        Respectfully Submitted

November 4, 2019            BY: Terry K. Ofori
─────────────                    ─────────────────────
    Dated.                          Terry K. Ofori, #1165768.

                                        Wallens Ridge State Prison

                                        P.O. Box 759

                                        Big Stone Gap, VA. 24219.



                TRIAL BY JURY IS DEMANDED.

−83−

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and as to those I believe them to be true. I certify under penalty of perjury that the foregoing is true and correct.

Executed at 'Big Stone Gap, Virginia,' on Nov 4, 2019.

BY: Terry K. Ofori

Terry K. Ofori, # 1165768

Wallens Ridge State Prison

P.O. Box 759

Big Stone Gap, VA. 24219.