IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| TERRY K. OFORI, | ) | |
|     Plaintiff, | ) | Civil Action No. 7:20-cv-00344 |
| | ) | |
| v. | ) | |
| | ) | By:  Elizabeth K. Dillon |
| LESLIE J. FLEMING, *et al.,* | ) |     United States District Judge |
|     Defendants. | ) | |

**MEMORANDUM OPINION**

Plaintiff Terry K. Ofori, an inmate in the custody of the Virginia Department of Corrections (VDOC), brought this action *pro se* under 42 U.S.C. § 1983 and the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C. § 2000cc, *et seq.*  Plaintiff alleges that he is unable to access a bathroom, sink, or other sanitary place to clean himself before or during religious services.  (Third Am. Compl. ¶¶ 29–31, Dkt. No. 61.)  Plaintiff also alleges that in 2019, he was prevented from getting on the Ramadan list and attending the Eid-ul-Adha service.  (*Id.* ¶¶ 38–41.)  These are the sole remaining claims in this action.  (*See* Dkt. No. 60.)

The remaining defendants in this action, Leslie J. Fleming, Carl A. Manis, and D. Collins, move for summary judgment.  (Dkt. No. 67.)  Plaintiff's claim about lack of bathroom access is brought under the First Amendment and RLUIPA against Fleming and Manis. Plaintiff's claim that he was prevented from getting on the Ramadan list and attending the Eid-ul-Adha service is brought under the First Amendment against Collins.  Defendants assert that Ofori failed to exhaust his administrative remedies and, even if he had exhausted such remedies, his claims fail on the merits as a matter of law.  Plaintiff filed a responsive brief.  (Dkt. No. 85.) Plaintiff also filed copies of several documents as additional evidence in opposition to defendants' motion (Dkt. No. 86), which the court considered in resolving this motion.

For the reasons stated below, this motion will be granted.

## I.  BACKGROUND

### A.  Parties and Procedural History

At all relevant times, plaintiff was housed at Wallens Ridge State Prison (WRSP). Fleming was the Warden at WRSP from January 2015 until June 2017.  Manis was the Warden at WRSP from June 2017 until January 2020.  D. Collins was the Chief of Housing and Programs at WRSP.

This action was severed from another case filed by plaintiff in 2018.  *Ofori v. Clarke*, No. 7:18cv587, Dkt. No. 1 (W.D. Va.)  Plaintiff's claim about lack of bathroom access was first raised in an amended complaint filed in the 2018 action.  (*See* Dkt. No. 1.)  The amended complaint was signed by plaintiff on November 4, 2019, and postmarked November 13, 2019. (*Id*.)

### B.  Bathroom Access Before and During Religious Services

Inmates at WRSP attend religious services with the inmates in their assigned housing unit.  For security reasons, inmates from different housing units do not mix for religious services or other activities.  WRSP has designated areas for religious services, including the gymnasium, two chow halls (A/B and C/D), and another smaller room.  Inmates must be on the master pass list to attend services.  (Affidavit of Thomas Hall (Hall Aff.) ¶ 4, Dkt. No. 68-3; Fleming Aff. ¶ 4, Dkt. No. 68-4; Manis Aff. ¶ 4, Dkt. No. 68-1.)

Muslim services are held on Fridays at a set time, and the location where the inmates worship depends on the size of the group of attendees from the housing unit.  The size of each group may vary because inmates who are on the master pass list to attend may choose not to attend service every week.  The yard officer usually assesses the size of the group as the inmates

are exiting the building and directs the larger group to the gymnasium, while the smaller groups go to their assigned dining hall, which is a short walk from their housing unit.  (Hall Aff. ¶ 4.)

The gymnasium has a bathroom that is made available for inmate use.  However, there is no bathroom available for inmate use in the chow halls.  The restroom in each of the two dining halls are primarily for the use of inmate kitchen workers.  The bathroom doors are solid doors that lock from the outside and must be unlock and monitored by the supervising security staff during inmate use.  These restrooms are closed during meals and religious services.  The solid door obscures the view of security staff into the restroom, which poses a security concern when inmates use the bathroom during services or meals.  In addition, there are not enough staff present during religious services to allow for officers both to lock and unlock the door for inmates to use the restroom while also monitoring other inmates at the services.  (Hall Aff. ¶ 5; Fleming Aff. ¶ 4; Manis Aff. ¶ 4.)

Religious services have a set schedule on the same time and day of the week.  Inmates know this schedule and have time to prepare for the services.  A service may occur during in-pod recreation, but inmates have access to the toilet and sink in their cell while recreating in the pod. A warning is given five minutes before inmates are released for religious services in order to give them time to get ready.  (Hall Aff. ¶ 5; Fleming Aff. ¶ 5; Manis Aff. ¶ 5.)

For security reasons, if an inmate leaves a service to return to his cell, it is unlikely he would be permitted to return to the service.  Most religious services last an hour.  All movement at WRSP is timed, and inmates must be on the master pass list to attend services.  Inmate movement is monitored by security staff in the inmate's assigned building, the control rooms, on the yard and boulevard, and at the location of the service.  Canines are also present during inmate movement.  (Fleming Aff ¶ 6; Manis Aff. ¶ 5.)

**C.  Ramadan and Eid-ul-Adha Accommodations in 2019**

On March 5, 2019, A. David Robinson, Chief of Corrections Operations for VDOC, issued a memorandum to the Wardens and Superintendents of VDOC facilities regarding the observance of Ramadan, Nation of Islam (NOI) and Moorish Science Temple of America (MSTA) Month of Fasting, and the Eid-ul-Fitr and Eid-ul-Adha observances.  The memo confirmed the dates for the Ramadan observance (May 5, 2019, through June 3, 2019), described inmate sign-up procedures, and provided additional guidance and consideration for the observance.  Wardens were directed to ensure that inmates were informed of scheduling and observance plans.  (Affidavit of M. Hensley (Hensley Aff) ¶ 5, Encl. A, Dkt. No. 68-2.)

Robinson's memorandum indicated that the Eid-ul-Adha (Feast of Sacrifice) prayer service would be held (separately for Muslin, NOI, and MSTA inmates) between sunrise and noon on Friday, August 2, 2019.  A feast meal would be provided as either a lunch meal or evening meal within three days following the prayer service.  Each facility could set either August 2, 3, or 4, 2019, for the Eid-ul-Adha feast.  This meal would be provided to the entire inmate population, except for Common Fare participants, who would be provided a Common Fare Eid feast meal.  There was no requirement for a separate sign-up process for Eid-ul-Adha participation, since inmates who registered for Ramadan would be approved for the Eid-ul-Adha observance.  In a later memo, Robinson corrected the dates for the Eid-ul-Adha observance to August 11, 12, or 13, 2019.  (Hensley Aff. ¶¶ 5, 7, Encls. A, C.)

On March 11, 2019, the Chaplain at WRSP issued a memo to all Sunni Muslim, NOI, and MSTA inmates regarding Ramadan/Month of Fasting with the beginning and end dates for the observance.  Inmates were instructed to complete the form by selecting whether they wanted to participate in the Sunni, NOI, or MSTA Ramadan/Month of Fasting, and return it to the WRSP

4

Treatment Department no later than April 5, 2019.  There was no separate sign-up process to participate in the Eid feasts or prayer services.  (Hensley Aff. ¶ 6, Encl. B.)

When Robinson's memorandum was received at WRSP, it was delivered to each inmate at his cell.  Requests to participate in Ramadan were to be sent to M. Hensley, the Institutional Programs Manager.  She coordinates with the Chaplain to determine eligibility.  The inmate receives a date stamped copy of his request confirming that the request has been received. Hensley then creates a list of all inmates approved to participate in the Ramadan/Month of Fasting observances and ensures that a copy of the list is posted in the offender housing units 21 days prior to the start of the observance.  (Hensley Aff. ¶ 8.)

Defendant Collins, the Chief of Housing and Programs, was not responsible for handling inmate sign-ups for the 2019 Ramadan observance.  After inmates were put on the list to participate, he was responsible for tracking food orders through Keefe Commissary and inmate payments for these items.  (Affidavit of D. Collins (Collins Aff.) ¶ 4, Dkt. No. 68-5.)

Inmates who have been placed on the Ramadan/Month of Fasting list are not to be removed from that list for any reason.  Once the registration deadline has passed, inmates cannot be added to the list unless they have arrived from another prison or there has been an emergency situation that has taken the inmate away from the facility.  Hensley was responsible for providing a final number of participants to the commissary so that ample food for the observance can be ordered.  Adding inmates to the Ramadan list after the deadline frustrates this advanced planning and could result in inadequate supplies for those inmates who complied with the deadline. (Hensley Aff. ¶ 9.)

Plaintiff avers that he completed a Ramadan application for 2019 in a timely manner. (Ofori Affidavit ¶ 14, Dkt. No. 84-1.)  Hensley found no record that she received a request from

plaintiff to participate in Ramadan and the Eid-ul-Adha service in 2019. Whether or not Ofori signed up for Ramadan, he would have still received the Eid feast meal along with the rest of the inmate population. Also, he could have submitted a request to Hensley or to the Chaplain to participate in the Eid-ul-Adha service even if he was not on the Ramadan registration list, but no such request was received. (Hensley Aff. ¶ 10.)

Plaintiff submitted an Informal Complaint on May 10, 2019, which was received on May 14, 2019. Plaintiff complained that he had submitted his Ramadan application several months ago, but he was not placed on the list for Ramadan. Collins responded on May 17, 2019, stating that no application had been received from plaintiff, and the deadline had been April 5, 2019. (Collins Aff. ¶ 5, Encl. A.) Collins states that if plaintiff had submitted a request by the registration deadline, he would have referred the request to Hensley. Collins does not recall receiving any such request. (Collins Aff. ¶ 6.)

## D. Administrative Remedies at VDOC

VDOC Operating Procedure (OP) 866.1, *Offender Grievance Procedure*, governs inmate grievances and provides that all issues which affect the grievant personally are grievable except those pertaining to policies, procedures, and decisions of the Virginia Parole Board, disciplinary hearings, state and federal court decisions, laws and regulations, and other matters beyond the control of VDOC. (Affidavit of D. Ravizee (Ravizee Aff.) ¶ 4, Encl. A, Dkt. No. 68-6.) Those grievances that do not meet the filing requirements of OP 866.1 are returned to the inmate within two working days from the date of receipt noting the reason for return on the intake section of the grievance form.[1] The inmate is instructed how to remedy any problems with the grievance.

---

[1] Reasons include, but are not limited to, more than one issue per grievance, expired filing period, repetitive, and requests for services. (Ravizee Aff. ¶ 4.)

If an inmate wishes review of the intake decision on any grievance, he may send the grievance to the applicable Regional Ombudsman for a determination. There is no further review of the intake decision. Appealing the intake decision does not satisfy the exhaustion requirements.

Regular grievances must be submitted within 30 calendar days from the date of the incident. Prior to submitting a regular grievance, the inmate must demonstrate that he has made an effort to informally resolve his complaint. This may be accomplished by submitting an Informal Complaint form to the Grievance Department, at the relevant institution, who will then forward it to the appropriate Department Head. Prison staff should respond to the Informal Complaint within 15 calendar days to ensure that informal responses are provided prior to the expiration of the 30-day time period in which an offender may file his regular grievance. If the inmate is dissatisfied with the response to the Informal Complaint, the inmate may submit a regular grievance on the issue. If the inmate submits a regular grievance, he is required to attach the informal complaint as documentation of his attempt to resolve the issue informally. (Ravizee Aff. ¶ 5, Encl. A.)

There are three levels of review available for regular grievances.[2] The time limit for issuing a Level I response is 30 days, 20 days for a Level II response, and 20 days for a Level III response. Expiration of the time limit without issuance of a response at any stage of the process automatically qualifies the grievance for appeal to the next level of review. (Ravizee Aff. ¶ 6, Encl. A.)

---

[2] Level I reviews are conducted by the Warden or Superintendent of the facility where the inmate is located. If the inmate is dissatisfied with the Level I determination, he may appeal the determination to Level II. Level II reviews are conducted by the Regional Administrator, Health Services Director, Superintendent for Education or the Chief of Operations for Offender Management Services. For most issues, Level II is the final level of review. For those issues appealable to Level III, the Chief of Corrections Operations or Director of the VDOC conducts a review of the regular grievance. (Ravizee Aff. ¶ 6, Encl. A.)

**E.  Plaintiff's Grievance Activity**

Plaintiff submitted a regular grievance on May 30, 2019, complaining that his application to get on the 2019 Ramadan list was not processed.  On June 19, 2019, Warden Manis issued a Level I grievance response deeming the grievance unfounded.  Investigation of the grievance determined that the designated staff did not receive a Ramadan application from plaintiff prior to the April 5, 2019 deadline.  The only information received from plaintiff regarding Ramadan was a written complaint received on May 14, 2019.  Plaintiff was responsible for submitting the paperwork within the deadline to the proper authority.  Plaintiff appealed the Warden's Level I decision to the Regional Administrator at Level II, where the decision was upheld on July 3, 2019.  (Ravizee Aff. ¶ 9, Encl. D.)

On September 6, 2019, plaintiff submitted a regular grievance in which he complained that he was not permitted to attend the Eid-ul-Adha service because officials claimed he was not on the list.  On September 19, 2019, plaintiff withdrew his grievance.  (Ravizee Aff. ¶ 10, Encl. E.)

Plaintiff submitted a regular grievance on September 23, 2019, complaining that the Eid-ul-Adha service was held on August 11, 2019, but the required feast meal was not served until the next day in violation of Islamic practice.  On October 8, 2019, Warden Manis issued a Level I grievance response that the grievance was unfounded.  Investigation determined that the Eid-ul-Adha prayer services were held on August 11, and the feast meal observed the following day, but this complied with the Ramadan Memorandum.  Plaintiff appealed the Level I decision to the Regional Administrator at Level II, where the decision was upheld on October 23, 2019.  (Ravizee Aff. ¶ 11, Encl. F.)

8

In addition to grievances about Ramadan participation, plaintiff also submitted a regular grievance on November 26, 2019, complaining about lack of bathroom access during Muslim services.  (Ravizee Aff. ¶ 8.)  The appeal process on this grievance was completed on January 7, 2020.  (*Id.*)  Plaintiff also filed a regular grievance on this issue on July 7, 2022.  (*Id.* ¶ 7.)  Plaintiff appealed, and the grievance was upheld.  (*Id.*)

Inmates such as plaintiff are oriented to the Offender Grievance Procedure when they are initially received into VDOC, as well as each time they are transferred to a different facility.  Forms to submit Informal Complaints and Regular Grievances are made readily available to inmates.  (Ravizee Aff. ¶ 12, Encl. G.)

## II.  ANALYSIS

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  The party seeking summary judgment bears the initial burden of showing the absence of any genuine issues of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  If the moving party meets this burden, the nonmoving party "may not rest upon the mere allegations or denials of its pleading, but must set forth specific facts showing there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Additionally, the party opposing summary judgment

9

"must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586.  That is, once the movant has met its burden to show absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial.  Fed. R. Civ. P. 56(c); *Celotex Corp.*, 477 U.S. at 323–25.  Although all justifiable inferences are to be drawn in favor of the non-movant, the non-moving party "cannot create a genuine issue of material fact through mere speculation of the building of one inference upon another."  *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The court is charged with liberally construing complaints filed by *pro se* litigants, to allow them to fully develop potentially meritorious cases.  *See Cruz v. Beto*, 405 U.S. 319 (1972); *Haines v. Kerner*, 404 U.S. 519 (1972).  At the summary judgment stage, however, the court's function is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.  *See Chisolm v. Moultrie*, C/A No. 4:21-03506-BHH-TER, 2023 WL 3631798, at *1 (D.S.C. May 2, 2023).  A court cannot assume the existence of a genuine issue of material fact where none exists.  Fed. R. Civ. P. 56(c).

## B.  Plaintiff's Claims

As noted above, plaintiff has two claims remaining in this action.  First, he alleges that he is unable to access a bathroom, sink, or other sanitary place to clean himself before or during religious services.  This claim is brought under the First Amendment and RLUIPA against defendants, former Wardens, Fleming and Manis.  (Third Am. Compl. ¶¶ 29–31.)  Second, plaintiff alleges that in 2019, he was prevented from getting on the Ramadan list and attending the Eid-ul-Adha service.  This claim is brought under the First Amendment against Collins.  (*Id.* ¶¶ 38–41.)

**C.  Ofori's Claims Are Barred By His Failure To Exhaust Administrative Remedies**

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 of [title 42], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002)).  A prisoner must exhaust all available administrative remedies, whether they meet federal standards or are plain, speedy, or effective.  *Davis v. Stanford*, 382 F. Supp. 2d 814, 818 (E.D. Va. 2004).  Even if exhaustion would be futile because those remedies would not provide the relief the inmate seeks, it is nonetheless required.  *Id.*  Ordinarily, an inmate must follow the required procedural steps to exhaust his administrative remedies.  *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008).  An inmate's failure to follow the required procedures of the prison's administrative remedy process, including time limits, or to exhaust all levels of administrative review is not "proper exhaustion" and will bar the claim.  *Woodford v. Ngo*, 548 U.S. 81, 85, 90 (2006).  The exhaustion requirement applies to plaintiff's § 1983 and RLUIPA claims.  *See Germain v. Shearin*, 653 F. App'x 231, 233 (4th Cir. 2016) (citing *Anderson v. XYZ Corr. Health Servs., Inc.*, 407 F.3d 674, 676 (4th Cir. 2005) (§ 1983 claims); *Wall v. Wade*, 741 F.3d 492, 495 (4th Cir. 2014) (RLUIPA claims)).

Exhaustion serves "two main purposes."  *Woodford*, 548 U.S. at 89.  First, the exhaustion requirement "protects administrative agency authority" by allowing the agency the "opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court."  *Id.*  Second, "exhaustion promotes efficiency" because "[c]laims generally can be

resolved much more quickly and economically in proceedings before an agency than in litigation in federal court." *Id.*

In addition, the court is "obligated to ensure that any defects in administrative exhaustion were not procured from the action or inaction of prison officials." *Aquilar-Avellaveda v. Terrell*, 478 F.3d 1223, 1225 (10th Cir. 2007); *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). Accordingly, an inmate need only exhaust "available" remedies. § 1997e(a). An administrative remedy is not available if "a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore*, 517 F.3d at 725.

### 1. Restroom access claim

Plaintiff has filed two regular grievances on this issue and appealed them through all available levels of review. However, plaintiff did not complete the grievance process prior to alleging this claim in federal court. As noted above, plaintiff first raised the bathroom access claim in his first amended complaint that was signed on November 4, 2019, and postmarked November 26, 2019. (Dkt. No. 1.) At that time, plaintiff had not filed any grievances. He filed a regular grievance on November 26, 2019, and the appeal process was completed on January 7, 2020. This claim is therefore barred because exhaustion must be accomplished prior to filing suit. *See Moore*, 517 F.3d at 725 (stating that under the PLRA, a prisoner must exhaust available administrative remedies "prior to filing suit in federal court"). "The plain language of the statute makes exhaustion a precondition to filing an action in federal court. The prisoner, therefore, may not exhaust administrative remedies during the pendency of the federal suit." *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) (internal citations omitted); *Germain v. Shearin*, 653 F. App'x 231, 234 (4th Cir. 2016) ("Exhaustion has not occurred and dismissal is warranted

when an institution's appeal process necessarily must continue after the filing of the complaint.").

Plaintiff argues that he attempted to exhaust this issue, but his efforts were "circumvented" on various occasions. (Dkt. No. 84 at 6.) The court has thoroughly reviewed plaintiff's submissions on summary judgment, including his affidavits and accompanying exhibits (*see* Dkt. Nos. 84, 84-1, 84-2, 86), and concludes that plaintiff has not created an issue of fact on the issue raised by defendant's motion: plaintiff's failure to exhaust this issue *before* commencing litigation in federal court. Whatever obstacles plaintiff may have encountered, he ultimately did complete the grievance process, and he cannot place the blame on defendants for filing this federal lawsuit before that process was finished.

Therefore, Fleming and Manis are entitled to summary judgment on this claim based on plaintiff's failure to exhaust his administrative remedies.

### 2. Eid-ul-Adha accommodation claim

Plaintiff also did not exhaust his claim regarding his inability to participate in the 2019 Eid-ul-Adha service. Plaintiff did file a regular grievance complaining that he was not allowed to attend this service, but he later withdrew that grievance. (Ravizee Aff. ¶ 10, Encl. E.) By withdrawing his grievance before completing the process, plaintiff failed to fully exhaust his complaint. *See Hawkins v. Lundy*, Civil Action No. 7:18cv00591, 2021 WL 5746007, at *6 (W.D. Va. Dec. 2, 2021) (finding prisoner did not exhaust administrative remedies when he withdrew the grievance before it was fully exhausted). Plaintiff's later grievance, complaining that the feast meal was held on a different day than the prayer service, does not serve to exhaust his claim of being able to attend the Eid-ul-Adha service. *See Hall v. Hopkins*, No. 7:10cv393, 2011 WL 6046610, at *3 (W.D. Va. Dec. 5, 2011) (finding that the plaintiff failed to exhaust his

specific claim against a defendant and noting that "proper exhaustion requires grievances to contain sufficient detail as to alert prison officials of constitutional claims now alleged as [the] basis for relief"). They are distinct issues.

Collins is therefore entitled to summary judgment on plaintiff's Ed-ul-Adha's accommodation claim due to plaintiff's failure to exhaust.

**D. Even If Ofori Had Exhausted His Administrative Remedies, His Claims Fail On The Merits.**

Even if the court assumes that Ofori had exhausted his administrative remedies or that he was somehow excused from doing so, he cannot prevail on the merits as a matter of law. Under the Free Exercise Clause of the First Amendment, inmates retain a right to reasonable opportunities for free exercise of religious beliefs without concern for the possibility of punishment. *See Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam). In order to state a claim for violation of rights secured by the Free Exercise Clause, as a threshold matter, an inmate must demonstrate that he holds a sincere religious belief, and that a prison practice or policy places a substantial burden on his ability to practice his religion. *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citing *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718 (1981)).

Prison restrictions that affect the free exercise of religion but are related to legitimate penological objectives, however, do not run afoul of the Constitution. *See Turner v. Safely*, 482 U.S. 78, 89–91 (1987). To determine if the restrictions on religious exercise are related to legitimate penological objectives, courts consider:

> (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates"; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether

> there exist any "obvious, easy alternatives" to the challenged
> regulation or action.

*Wall v. Wade*, 741 F.3d 492, 499 (4th Cir. 2014) (quoting *Lovelace v. Lee*, 472 F.3d 174, 200

(4th Cir. 2006)).

Plaintiff also alleges violations of RLUIPA, which provides, in part:

> No government shall impose a substantial burden on the religious
> exercise of a person residing in or confined to an institution . . . even
> if the burden results from a rule of general applicability, unless the
> government demonstrates that imposition of the burden on that
> person—(1) is in furtherance of a compelling government interest;
> and (2) is the least restrictive means of furthering that compelling
> government interest.

42 U.S.C. § 2000cc-1(a).  RLUIPA "protects institutionalized persons who are unable freely to

attend to their religious needs and are therefore dependent on the government's permission and

accommodation for exercise of their religion."  *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).

Thus, RLUIPA is aimed at ensuring that prisoners were entitled to similar religious free-exercise

rights to those enjoyed by individuals who are not incarcerated.  *See Cutter*, 544 U.S. at 715–17.

RLUIPA defines "religious exercise" as "any exercise of religion, whether or not

compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A); *Holt v.

Hobbs*, 574 U.S. 352, 361 (2015).  Under RLUIPA, the inmate must show that the challenged

policy substantially burdens his exercise of his religion.  *See* 42 U.S.C. § 2000cc-2(b); *Holt*, 574

U.S. at 361.  A substantial burden exists where a regulation "puts substantial pressure on [the

plaintiff] to modify its behavior."  *Jesus Christ is the Answer Ministries, Inc. v. Baltimore Cnty.*,

915 F.3d 256, 260 (4th Cir. 2019) (quoting *Bethel World Outreach Ministries v. Montgomery

Cnty. Council*, 706 F.3d 548, 556 (4th Cir. 2013)).  A prison regulation also imposes a

substantial burden when it "forces a person to choose between following the precepts of [his]

religion and forfeiting governmental benefits, on the one hand, and abandoning one of the

15

precepts of [his] religion . . . on the other hand." *Lovelace*, 472 F.3d at 187 (internal quotation marks and citation omitted).  "Substantial burden" under RLUIPA is the same as in the First Amendment context.  *Id.*

Ultimately, claims brought under the First Amendment are subject to a less demanding standard than claims brought under RLUIPA, with RLUIPA claims requiring "strict scrutiny instead of reasonableness." *Lovelace*, 472 F.3d at 199 n.8; *see Wright v. Lassiter*, 921 F.3d 413, 418 (4th Cir. 2019).  To hold defendants liable as individuals under RLUIPA, a plaintiff must further prove that the defendants acted intentionally rather than negligently.  *Lovelace*, 472 F.3d at 194.

Accordingly, RLUIPA and First Amendment claims proceed in two stages.  "At the first stage, which is essentially the same for both claims, the plaintiff must show that the prison's policies imposed a substantial burden on his exercise of sincerely held religious beliefs." *Wright*, 921 F.3d at 418.  If plaintiff can make that showing, the court proceeds to the second stage, asking whether the prison's policies are justified despite the burden they impose. *Id.*  "The standards governing this second stage diverge for RLUIPA and First Amendment claims." *Id.*; *see also Carawan v. Mitchell*, 400 F. Supp. 3d 371, 389 (W.D.N.C. 2019).  Under RLUIPA, the government has the burden to show that its policies satisfy strict scrutiny; "that is, the policies must represent the least restrictive means of furthering a compelling governmental interest." *Id.* (citing 42 U.S.C. § 2000cc-1(a)).  Under the First Amendment, the plaintiff has the burden to show that the policies at issue are not "reasonably related to legitimate penological interests." *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015).

### 1. **Restroom access claim**

Plaintiff argues that his religion requires that he perform ablution before offering prayers and forbids holding in bodily waste.  (Third Am. Compl. ¶¶ 29–30.)  Thus, the lack of access to the chow hall restroom during Muslim services imposes a substantial burden on the exercise of his religion.  However, religious services are scheduled at the same day and time every week, and a warning is given five minutes before inmates are released for service.  (Hall Aff. ¶¶ 4–5.)  Moreover, outdoor recreation is not scheduled to conflict with services.  (Fleming Aff. ¶ 5.)  Thus, plaintiff would have had adequate opportunity to use the restroom and clean himself before attending services.  Further, the need to relieve himself during services would not arise often enough to impose a substantial burden because services last only an hour and are not always in the chow hall in any event.  An occasional inconvenience is not a substantial burden.  *See Smith v. Allen*, 502 F.3d 1255, 1278 (11th Cir. 2007) (explaining that a substantial burden requires "more than an inconvenience to one's religious practices") (abrogated on other grounds by *Sossamon v. Texas*, 563 U.S. 277 (2011)); *see also Brown v. Mathena*, No. 7:14cv20, 2014 WL 465378, at *5 (W.D. Va. Sept. 16, 2014) (A mere "inconvenience on religious exercise is not substantial").

Plaintiff argues that the inconvenience is more than occasional for him because he has stomach problems that cause him to use the bathroom often.  (Dkt. No. 84 at 11–12.)  Plaintiff asserts that he defecates four to five times a day and has no control over when he needs to use the bathroom.  (*Id.*; *see also* Ofori Aff. ¶ 32.)  This results in him missing part or all of the Friday services two or three times per month.  (*Id.*)  In support, plaintiff provides documentation regarding his food allergies, along with several grievances he filed complaining about the food he was being served.  (Dkt. No. 84-2 at 133–150 of 160.)  Still, and assuming that plaintiff's

assertions are true, bathroom use prior to the start of service would alleviate the issue in most instances.  It also bears repeating that services are not always held in rooms without bathroom access.  Ofori's particular issues are not enough to create an issue of fact on whether the bathroom policy imposes a substantial burden.  *See Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 761 (7th Cir. 2003) ("[I]n the context of RLUIPA's broad definition of religious exercise, a . . . regulation that imposes a substantial burden on religious exercise is one that necessarily bears direct, primary, and fundamental responsibility for rendering religious exercise . . . effectively impracticable."); *Living Water Church of God v. Charter Twp. Of Meridian*, 258 F. App'x 729, 735 (6th Cir. 2007) (stating that prison practices do not substantially burden an inmate's rights if they merely make his "religious exercise more expensive or difficult," but are "not inherently inconsistent with [his] beliefs"); *Marron v. Miller*, No. 7:13CV00338, 2014 WL 2879745, at *2 (W.D. Va. June 24, 2014) ("No substantial burden occurs if the government action merely makes the 'religious exercise more expensive or difficult' or inconvenient, but does not pressure the adherent to violate his or her religious beliefs or abandon one of the precepts of his or her religion.").

Even if substantially burdensome, the practice of holding services in the chow hall, and then prohibiting bathroom access in that area, is justified by legitimate security needs.  *See Turner*, 482 U.S. at 89–91.  Services are held in different areas of WRSP depending on the size of the group attending the service.  (Hall Aff. ¶ 4.)  Also, the chow hall restroom door locks from the outside, and because staff are required to escort inmates using the restroom to unlock the door, this limits their ability to monitor the rest of the service.  (*Id.* ¶ 5.)  Additionally, the solid door of the bathroom obscures the view of security staff, posing further security issues.  (*Id.*)  Finally, movement is timed and requires monitoring by correctional officers and canines, so

18

allowing inmates who go back to their cells to return to the service poses additional security risks. (Fleming Aff. ¶ 6; Manis Aff. ¶ 5.) Limiting restroom access in the chow hall is rationally related to that interest under the *Turner* First Amendment analysis.

In response, Ofori suggests several alternatives, including having prison staff sit at a table by the bathroom to monitor access, or allowing prisoners who return to their cells to then come back to rejoin the religious service. (*See* Dkt. No. 84 at 12.) For First Amendment purposes, plaintiff has not met his burden that the policies restricting bathroom access are not reasonably related to prison safety issues, which is, of course, a legitimate penological interest. *See, e.g.*, *Brooks v. Bishop*, Civil Action No. PWG-17-3063, 2019 WL 1317227, at *14 (D. Md. Mar. 22, 2019) (finding no substantial burden because inmates could use bathroom prior to service, and the practice was justified by a compelling security interest in light of institution's history of gang violence and limited staffing and space for religious services).[3]

Finally, defendants are also entitled to qualified immunity on the First Amendment claim. An inmate's First Amendment right to access a restroom during religious services is not clearly established. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'") (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). As noted above, courts have found no First Amendment violation when prisons have limited bathroom access during religious services. *See Goins v. Kiser*, Case No. 7:19CV00673, 2020 WL

---

[3] For purposes of RLUIPA, however, the court cannot conclude that the bathroom access policy is the least restrictive means of furthering security interests because defendants did not attempt to meet their burden in this regard. Instead, defendants treated the RLUIPA analysis functionally the same as the First Amendment "rationally related" analysis. (Defs. Mem. at 19, Dkt. No. 68.) This "gets things backward" because it is "the government that must show its policy 'is the least restrictive means of furthering [a] compelling governmental interest.'" *Firewalker-Fields v. Lee*, 58 F.4th 104, 119 (4th Cir. 2023) (quoting *Ramirez v. Collier*, --- U.S. ----, 142 S. Ct. 1264, 1281 (2022)). The court will not belabor the point because defendants are entitled to summary judgment on this claim for other reasons set forth in this opinion.

2529619, at *4 (W.D. Va. May 18, 2020) (finding no substantial burden to similar practice at Red Onion State Prison, partly because inmates had the opportunity to use the bathroom prior to Muslim services); *see also Brooks*, 2019 WL 1317227, at *14.

Accordingly, Fleming and Manis are entitled to summary judgment on the merits of plaintiff's bathroom access claim under RLUIPA and the First Amendment.

### 2. Eid-ul-Adha accommodation claim

Ofori's claim regarding his exclusion from the Ramadan list and inability to attend the Eid-ul-Adha service is a First Amendment claim against Collins, the Chief of Housing and Programs. Collins, however, was not responsible for signing inmates up for the Ramadan observance. He was only responsible for coordinating food orders for those inmates who had registered. (Collins Aff. ¶ 4.) Thus, plaintiff cannot establish Collins' personal involvement, which is required to state a claim under § 1983. *See Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017). At best, plaintiff's claim sounds in negligence, but § 1983 liability does not arise "for mere negligence, or even gross negligence, in failing to detect and prevent subordinates' misconduct. Instead, a supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 464 (M.D.N.C. 2016); *see also Baynard v. Malone*, 268 F.3d 228, 236 (4th Cir. 2001). Collins did respond to plaintiff's informal complaint (Collins Aff. ¶ 5, Encl. A), but such a response ordinarily does not give rise to liability under § 1983. *See Brown v. Clarke*, Civil Action No. 7:15cv00414, 2016 WL 4544548, at *2 (W.D. Va. Aug. 31, 2016) ("'Ruling against a prisoner on an administrative complaint does not cause or contribute to [a constitutional] violation.'") (quoting *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007)).

Accordingly, there are no genuine issues of material fact on plaintiff's Eid-ul-Adha accommodation claim, and Collins is entitled to judgment as a matter of law.

## III.  CONCLUSION

For the reasons stated in the foregoing opinion, defendants' motion for summary judgment will be granted.  The court will issue an appropriate order.

Entered: September 28, 2023.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
United States District Judge